# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

MARIA QUINTO-COLLINS, et al.,)
                             )   CERTIFIED COPY
             Plaintiffs, )
                             )
        vs.                  )CASE NO.: 3:21-cv-06094-VC
                             )
CITY OF ANTIOCH, et al.,     )
                             )
             Defendants. )
_____)      CERTIFIED COPY

VIDEOCONFERENCE

DEPOSITION OF OFFICER JAMES PERKINSON

TUESDAY, APRIL 18, 2023

10:06 A.M. - 2:56 P.M.

APPEARING FROM SUN CITY WEST, ARIZONA

REPORTED BY:  DEBRA J. SKAGGS, CSR NO. 7857

1

DEPOSITION OF OFFICER JAMES PERKINSON - VIDEOCONFERENCE

```
 1                       INDEX OF EXAMINATION

 2

 3    WITNESS:  OFFICER JAMES PERKINSON

 4

 5    EXAMINATION                                       PAGE

 6    By Mr. Nisenbaum                                    7

 7                           --o0o--

 8

 9    Appearance Page                                     3

10    Exhibit Page                                        4

11    Location                                            5

12    Declaration Under Penalty of Perjury              188

13    Reporter's Certificate                            189

14    Disposition                                       190

15    Witness Letter                                    191

16    Deposition Errata Sheet                           192

17    Attorney's Notes                                  193

18

19                           --o0o--

20

21

22

23

24

25

                                                        2
```

```
 1                    REMOTE APPEARANCES

 2

 3   FOR PLAINTIFFS MARIA QUINTO-COLLINS, ANDREI CARLOS
                 QUINTO, and ISABELLA COLLINS:
 4
         BURRIS, NISENBAUM, CURRY & LACY, LLP
 5       BY: BEN NISENBAUM, ATTORNEY AT LAW
         Airport Corporate Center
 6       7677 Oakport Street, Suite 1120
         Oakland, California 94621
 7       510.839.5200
         bnisenbaum@gmail
 8

 9   FOR DEFENDANTS CITY OF ANTIOCH, et al.:

10       McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
         BY: NOAH G. BLECHMAN, ATTORNEY AT LAW
11       3480 Buskirk Avenue, Suite 250
         Pleasant Hill, California 94523
12       (925) 939-5330
         noah.blechman@mcnamaralaw.com
13

14   ALSO PRESENT REMOTELY:
         Officer Nicholas Shipilov
15

16   ALSO PRESENT REMOTELY WITH ATTORNEY NISENBAUM:
         Maria Quinto-Collins
         Andrei Carlos Quinto
17       Isabella Collins

18   ALSO PRESENT REMOTELY WITH ATTORNEY BLECHMAN:
         Officer Daniel Hopwood
19       Officer Arturo Becerra

20                        --o0o--

21

22

23

24

25
                                                        3
```

**DEPOSITION OF OFFICER JAMES PERKINSON - VIDEOCONFERENCE**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

INDEX TO EXHIBITS
WITNESS: JAMES PERKINSON
TUESDAY, APRIL 18, 2023

| PLAINTIFFS' EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| 1 (Confidential) | Bates CONFIDENTIAL APD 000699 City of Antioch Personnel Action Form, re: Education Incentive Pay for Officer Perkinson | 19 |
| 2 | Audio file -- Officer Perkinson's Post-Incident Interview dated December 24, 2020 | 38 |
| 3 | 21 pages - Contra Costa County DA's office Investigation Report dated March 27, 2023 re: PC 745 Racial Justice Act | 59 |
| 4 | 14 pages - Contra Costa County DA's office Investigation Report dated March 28, 2023, re: PC 745 Racial Justice Act | 75 |
| 5 | Video file - Arlo video "t2313.mp4" | 101 |
| 6 | Video file - Ring video "ring01.mp4" | 105 |
| 7 | Video file - Ring video "ring02.mp4" | 144 |
| 8 | Video file - Ring video "ring03.mp4" | 150 |
| 9 | Video file - Ring video "ring04.mp4" | 157 |
| 10 | Video file - Arlo video "t2320.mp4" | 159 |
| 11 | Video file - Arlo video "t2324.mp4" | 160 |
| 12 | Video file - Arlo video "t2326.mp4" | 162 |
| 13 | Video file - Arlo video "t2327.mp4" | 163 |
| 14 | Video file - Arlo video "t2328.mp4" | 164 |

4

DEPOSITION OF OFFICER JAMES PERKINSON - VIDEOCONFERENCE

```
 1                          INDEX

 2                    EXHIBITS (CONTINUED)

 3
        15         Video file - Cell phone video
 4                 "12-23-2020-2300s.mov"                   166

 5      16         Video file - Arlo video
                   "t2332pt1.mp4"                           182
 6
        17         Video file - Arlo video
 7                 "t2332pt2.mp4"                           183

 8                         --o0o--

 9                  CONFIDENTIAL PORTIONS

10                       PAGE/LINE

11                    17/21 to 21/18

12                     86/3 to 87/1

13                         --o0o--

14                   CERTIFIED QUESTIONS

15                       PAGE/LINE

16                        53/16

17                        55/5

18                        60/11

19                        61/8

20                        61/15

21                        61/22

22                        64/14

23                        65/17

24                        66/13

25                        66/24
```

5

1  Q.       Okay.  Did you respond with lights and siren?

2  A.       I honestly don't recall because -- my

3  recollection is it was actually a short distance away;

4  it was a cold December night that there wasn't a lot of

5  traffic out.

6  Q.       Of course, you were not privy to the 911 call

7  itself; correct?

8  A.       Not at the time, no.

9  Q.       You didn't hear the 911 call until probably in

10 preparation for the coroner's inquest proceedings;

11 correct?

12 A.       That would be fair to say.

13 Q.       Okay.  So you're operating on information from

14 dispatch; right?

15 A.       Yes.

16 Q.       Did Officer Beccerra activate his lights and

17 siren?

18 A.       I don't recall.

19 Q.       And it took you about three minutes to arrive;

20 is that right?

21 A.       That sounds -- a fair estimate.

22 Q.       And when you arrived, were you able to hear

23 anything from the house?

24 A.       Well, I suppose at what point are you asking?

25 Like, as I pull up on -- at the house, I probably wasn't

95

1    hearing anything.  As I got closer to the house -- I

2    don't actually remember for sure.

3    Q.        Do you recall hearing anything from the house

4    before going inside?

5    A.        At this point no, I don't recall anything from

6    outside.

7    Q.        Who arrived first?  You or Beccerra?

8    A.        Beccerra was in front of me.

9    Q.        And I mean car-wise when you're driving up to

10   the scene.

11   A.        Again, I believe he pulled up in front of me,

12   and he walked up the driveway in front of me.

13   Q.        And at what point did you recognize the

14   location where you were at as having -- pertaining to

15   the events a couple months before?

16   A.        You know, I don't think it was until after

17   everything had settled down.  I don't -- I don't -- I

18   don't independently remember exactly when I realized

19   this might have been in the same area as the October

20   call.

21   Q.        Okay.  All right.  You saw someone you later

22   learned was Isabella Collins; correct?

23   A.        Yes.

24   Q.        When did you see her?

25   A.        I'm not sure if I actually saw her in front of

96

1   There is a different view of it from the Ring camera,

2   and we'll get to that at some point here.

3          All right.  So now, looking at -- so like I

4   said, the file is -2313, which means -- you may not know

5   this -- it means 11:13 P.M.

6          But that would be about the time that you

7   entered the house; is that right?

8   A.        That would be close, yes.

9   Q.        Okay.  How long did it take you from the time

10  that you entered the house to the time that the physical

11  restraint of Mr. Quinto began?

12  A.        I would have to just guess and say the walking

13  time to the back of that room and just kind of assessing

14  and whatnot, it probably would have been, like, maybe 30

15  seconds.  In that time frame.

16  Q.        Okay.  Fair to say it was pretty quick; right?

17  A.        Yes.

18  Q.        It's not a big house.  You didn't have to walk

19  through a maze of hallways.  Right?

20  A.        Correct.

21  Q.        Okay.  All right.  So I'll just play out the

22  rest of this video.

23          (Video file is playing.)

24          ATTORNEY NISENBAUM:  All right.  Now, I'm

25  going to go to -- I'm going to stop the Share, and I

                                                        104

1    striking her?

2    A.        I did not see anything that resembled him

3    striking her.

4    Q.        Did it look like he was choking or strangling

5    her?

6    A.        When I walked in the bedroom, I saw nothing

7    that appeared that way.

8    Q.        Did it look like -- did it look like he was

9    attacking her?

10   A.        I wouldn't describe it that way, no.

11   Q.        How would you describe it?

12   A.        It -- just they were bear-hugging each other.

13   They were holding onto each other.  She was asking for

14   help or something to that effect.  I don't specifically

15   recall what she was saying.

16   Q.        Okay.  All right.

17             Was Mr. Quinto saying anything?

18   A.        I know he was making noises.  And I want to

19   say, like, as we first walked in, he made some comment

20   about "Don't kill me."  And then he might have even

21   asked his mom or somebody "Don't let them kill me,"

22   something to that effect.  I don't -- unfortunately, we

23   didn't have cameras recording at that time, so I don't

24   specifically remember exactly.  But it was something

25   along those lines.

115

1          Then what happens?

2    A.        We separate the two parties.  The mom kind of

3    falls back off to the side, but still with her back up

4    against the entertainment center.  At one point I grab

5    handcuffs, I get a handcuff on his right hand, and I

6    pull it to the middle of his back --

7              (Interruption of an unidentified person

8              talking offline.)

9              ATTORNEY NISENBAUM:  Q.  Go ahead.

10   A.        I believe that Officer Beccerra was trying to

11   manipulate his left hand to get it to the center of his

12   back, and that took a little bit of a second, and then

13   he was in handcuffs at that point.  He continued to

14   kick, so I held his feet down.

15   Q.        How difficult was it to separate Mr. Quinto

16   from his mother?

17   A.        It -- I wouldn't describe it as real

18   difficult.

19   Q.        Okay.  And was Mr. Quinto trying to strike

20   you, or Officer Beccerra, or his mother when you tried

21   to separate him?

22   A.        I never felt like he was trying to assault

23   anybody at that time.

24   Q.        Okay.  He was clearly alive; right?

25   A.        He was moving, he was talking, he was res- --

118

1    Q.       Okay.  Did he have his knee still pinning the

2    shoulder down -- and by "he" -- did Officer Beccerra

3    have his knee on Mr. Quinto's left shoulder area,

4    pinning it down, when Officer Hopwood entered?

5           ATTORNEY BLECHMAN:  Objection.  Again,

6    misstates the witness's testimony; it's argumentative as

7    to pinning his shoulder down.

8           Go ahead and respond.

9           THE WITNESS:  I honestly don't recall at what

10   point Officer Hopwood entered the room at that point.

11          ATTORNEY NISENBAUM:  Q.  Well, you know

12   that after Officer Hopwood entered the room --

13   shortly after that, you got up; right?

14   A.       Yes.  So once there was another officer there

15   and the determination was to get an ambulance, myself

16   and Officer Beccerra kind of shifted, and I got up to

17   leave the room.

18   Q.       So Officer Beccerra was -- I'm sorry.

19          Officer Hopwood was in the second set of

20   officers that arrived; correct?

21   A.       Yes.

22   Q.       And is it fair to say that if Officer Hopwood

23   arrived four minutes after you did, that the restraint

24   of Mr. Quinto had gone on for approximately four minutes

25   prior to Officer Hopwood's arrival?

127

1          ATTORNEY BLECHMAN:  I'm going to object.  I

2    think it may misstate the records; it may misstate the

3    witness's testimony; argumentative.

4          Go ahead.

5          ATTORNEY NISENBAUM:  You know I would not

6    misstate the record on something like that, Noah.

7          ATTORNEY NISENBAUM:  Q.  Go ahead.

8    A.          Again, this was all transpiring very fast.  I

9    believe it was less than two minutes from our arrival

10   time to the point where he was detained.  I think it was

11   less than two minutes after he was detained that we were

12   requesting an ambulance to place him on a W&I 5150 hold.

13   And once I'm asking for the ambulance, leaving the room,

14   and at some point -- I don't know that Officer Beccerra

15   kept his leg on him the whole time.  I think at some

16   point he kind of shifted to put both of his knees on the

17   ground.

18   Q.          Did you see that?

19   A.          I do recall him having both knees on the

20   ground, yes.

21   Q.          Do you recall ever saying that prior to today?

22   A.          I don't know that I said that or not.

23   Q.          Okay.  In fact, while you were conversing with

24   his mom about mental health issues and possible drugs

25   and hallucinations, Officer Beccerra had his knee on

                                                  128

**DEPOSITION OF OFFICER JAMES PERKINSON - VIDEOCONFERENCE**

1  A.        I did tell you that that was my voice saying

2  "correct."  I did answer that question.

3  Q.        And you were answering "correct" -- I'll play

4  it again so it's clear --

5          ATTORNEY NISENBAUM:  And I wonder if the court

6  reporter might be able to transcribe it, the interview

7  on this portion?  Are you able to do that?

8          THE REPORTER:  I'll try.

9          ATTORNEY NISENBAUM:  It's a short section.

10  And let me make sure I'm cued up properly at 31:21.

11          "'OFFICER PERKINSON:  ...in a figure four.

12          It was just...'"

13          ATTORNEY NISENBAUM:  Q.  Okay.  Let me go

14  back just a shade -- before I do that, let me ask

15  you this.

16          While you were applying the figure four to

17  Mr. Quinto, was Officer Beccerra kneeling on

18  Mr. Quinto's shoulder?

19  A.        I believe there was a short time that he might

20  have been.

21  Q.        My question again -- yes or no -- was Officer

22  Beccerra kneeling on Mr. Quinto's left shoulder while

23  you were applying the figure four?

24  A.        Again, I'm unclear.  I believe it's possible

25  that he did.  When I'm holding the leg in the figure

135

1    four, my attention is turned to the mother to try to get

2    some facts as to what's going on.

3    Q.       You didn't tell the investigators you were

4    unclear.  You answered "correct."  Right?

5            ATTORNEY BLECHMAN:  Hold on a second.

6            It's argumentative as phrased; it's vague and

7    ambiguous as to "you answered 'correct.'"

8            But you can respond.

9            THE WITNESS:  Did I tell the -- did I answer

10   the question of the investigators that way?  Yes, I did.

11           ATTORNEY NISENBAUM:  Q.  Okay.  So I'm

12   going to play it starting at 31:15.  It's about --

13   approximately a 20-second segment.

14           ATTORNEY NISENBAUM:  And Madam Court Reporter,

15   if you could transcribe it, that would be awesome.

16           THE REPORTER:  Okay.

17           ATTORNEY NISENBAUM:  Q.  All right.

18           "'OFFICER PERKINSON: -- once -- it was

19           definitely on the calves.  It was below the

20           knee.  And then when I folded his legs

21           into the figure four, it was just by hand that

22           I was holding one --

23           'Q.  So there is no pressure -- there is

24           pressure on the knees, and then Beccerra is on

25           -- on his shoulder --

136

1    ATTORNEY NISENBAUM:   Q.   There was no --

2    no indication that Mr. Quinto had committed a crime;

3    correct?

4    A.         At what point am I determining that?

5    Q.         Well, at some point in this incident you

6    determined that Mr. Quinto had committed no crime -- or

7    there was no indication that he had committed a crime;

8    correct?

9    A.         That would be correct.   At some point I did

10   determine that it did not appear to be a crime.

11   Q.         Okay.  Let me go -- now that we've had a

12   chance to discuss it and listen to your testimony.  Can

13   you give your best estimate as to how long Officer

14   Beccerra's knee was on Mr. Quinto's shoulder while

15   Mr. -- while Mr. Quinto was on the ground after

16   Mr. Quinto was handcuffed?

17   A.         Again, I'm going to stick to what I said

18   earlier.  I believe it was 30 to 60 seconds.  And I

19   could be mistaken, but that's my estimate.

20   Q.         Okay.  It was clear to you that this was a

21   mental health issue, possibly with underlying

22   intoxication; correct?

23        ATTORNEY BLECHMAN:  Vague as to time -- hold

24   on.  Vague as to time as to when this was an appearance

25   to the officer.

138

1  left shoulder when Officer Hopwood entered?

2  A.         I cannot recall that.  I honestly can't recall

3  at what point Officer Hopwood actually walked in.

4  Q.         Okay.  And so you don't know the answer one

5  way or the other, then; correct?

6  A.         Correct.

7  Q.         Okay.  All right.  Let me share the screen.

8             So this is Ring 2.  Are you able to see the

9  time and date, or do I have to do it the way I did

10 before?

11 A.         I do not see the time stamp.

12 Q.         Okay.  Let me do it the way I did before.

13            Okay.  Are you able to see it now?  Do I need

14 to move it up?

15 A.         Yeah, I still don't see it.

16 Q.         Okay.  Let me...

17 A.         There it is.

18 Q.         Okay.  So here we have on the bottom right,

19 12/23/2020 at 23:17:23; correct?

20 A.         Yes.

21 Q.         That's four minutes after you made entry;

22 correct?

23 A.         It appears so.

24 Q.         Okay.  And I'll click "Play."

25            (Video file is playing.)

                                                          145

1           ATTORNEY NISENBAUM:   Pausing at 7 seconds.

2           ATTORNEY NISENBAUM:   Q.   We hear a sound

3   of somebody making grunting-type sounds.   Is that

4   Mr. Quinto?

5   A.        I believe so.

6   Q.        Okay.   And we have -- you see an officer

7   entering the house; correct?

8   A.        Yes.

9   Q.        Is that Officer Hopwood?

10  A.        I actually don't believe so.

11  Q.        Is that -- is that Shipilov?

12  A.        I believe that's who it looked like, but I

13  could be mistaken.

14  Q.        Okay.   I'll continue.   At this point -- well,

15  strike that.

16            What was Mr. Quinto doing at this point in the

17  restraint, if you know?

18  A.        I don't have any independent recollection at

19  this point.

20  Q.        Okay.   Once Mr. Quinto was handcuffed -- well,

21  strike that.

22            It took how long to get him in cuffs?   About

23  30 seconds?

24  A.        From time of entry -- yeah -- maybe.

25  Q.        Approximately; right?

146

1   A.        Yeah, approximately.

2   Q.        Okay.  So after --

3             ATTORNEY BLECHMAN:  Hold on.  Sorry.

4             From what point are you asking about?

5             ATTORNEY NISENBAUM:  From point of entry --

6   point of making entry into the house to putting

7   Mr. Quinto in handcuffs.

8             ATTORNEY BLECHMAN:  Okay.

9             Is that how you understand the question,

10  Officer Perkinson?

11            THE WITNESS:  I believe so.

12            ATTORNEY BLECHMAN:  Thank you.

13            ATTORNEY NISENBAUM:  Q.  Okay.  All right.

14            So he's been handcuffed now for approximately

15  three and a half minutes; correct?

16  A.        That would be a fair estimate.

17  Q.        Okay.  And that means he's been in a prone

18  restraint for three and a half minutes, approximately;

19  correct?

20            ATTORNEY BLECHMAN:  Vague and ambiguous --

21            THE WITNESS:  Yep.

22            ATTORNEY BLECHMAN:  -- as to "prone

23  restraint."

24            But go ahead.

25            THE WITNESS:  It appears that that's the

147

```
 1   the record.
 2              (Recess: 1:43 P.M. to 1:52 P.M.)
 3              ATTORNEY BLECHMAN:  I think it looks like
 4   we're ready.
 5              ATTORNEY NISENBAUM:  Okay.  All right.
 6              If I could have the last question -- I don't
 7   need the answer; just the question read back.
 8              (Record read by the Reporter as follows:
 9              "Q. So that was time-stamped
10              23:17:23...")
11              ATTORNEY NISENBAUM:  Q.  All right.  So
12   now, moving to Ring 3 --
13              ATTORNEY NISENBAUM:  We'll make this the next
14   exhibit in order.
15              THE REPORTER:  Exhibit 8.
16              ATTORNEY NISENBAUM:  Okay.
17                   (Plaintiffs' Exhibit 8 marked
18                   for identification.)
19              ATTORNEY NISENBAUM:  Q.  Okay...
20              (Pause.)
21              Are you --
22   A.         Right there.  Yep.
23   Q.         So you can see it now?  It's 23:20:02.
24              So that's 11:20; correct?
25   A.         Yes.
```

150

1   Q.       About a little more than 2 1/2 minutes later

2   from the last Ring video.

3   A.       Sure.

4   Q.       Okay.  Do you know who this is exiting?

5            I'll play it.  It's a 12-second clip.

6            (Video file is playing.)

7            ATTORNEY NISENBAUM:  Q.  Can you --

8   A.       Officer -- Officer Shipilov exited first, and

9   I followed behind.

10  Q.       Okay.  All right.

11           And the restraint was still going on at this

12  time; correct?

13           ATTORNEY BLECHMAN:  Vague and ambiguous as to

14  "the restraint."

15           ATTORNEY NISENBAUM:  Let me be clear about it.

16           ATTORNEY NISENBAUM:  Q.  The prone

17  restraint of Mr. Quinto was still taking place at

18  this time as you exited; correct?

19           ATTORNEY BLECHMAN:  I'm going to object to the

20  term "prone restraint"; and argumentative as to

21  "restraint."

22           But you can respond.

23           THE WITNESS:  I believe so.

24           ATTORNEY NISENBAUM:  Q.  Okay.  And why do

25  you believe that?

151

DEPOSITION OF OFFICER JAMES PERKINSON - VIDEOCONFERENCE

1    A.       That was how he was left when I left the room.

2    Q.       Okay.  And again, it didn't take you any real

3    time to leave the room; right?  A few seconds?

4    A.       Yeah.  I can't imagine it's more than 10 or 15

5    seconds to get out the door.

6    Q.       Okay.  And he was still in a prone restraint,

7    but now Officer Hopwood had taken over at the shoulder,

8    and you were -- and Officer Beccerra had moved to the

9    legs; correct?

10   A.       Officer Beccerra did move to the legs.  To be

11   honest, I don't know that I recall Officer Hopwood

12   actually restraining his upper body.

13   Q.       Okay.  Mr. Quinto was still in a prone

14   position on the ground when you left the room?

15   A.       He was.

16   Q.       Okay.  And he was making those sounds that we

17   heard; correct?

18   A.       Up to the point that I left the --

19   Q.       Right.

20   A.       Up to the point that I left the room, he had

21   been making noises and sounds.

22   Q.       Okay.  And I assume that nobody had removed

23   the handcuffs before you left; correct?

24   A.       That would be correct.

25   Q.       All right.  Let me look at one thing.

                                                        152

1        Okay.  I'm going to read from your coroner's

2   inquest interview, page 66, line 11 through line 21, and

3   you let me know if this refreshes your recollection.

4        Starting at line 11 of page 66.

5        "'A.  We shuffled positions, and Officer

6        Beccerra kind of comes down to his legs.  And

7        then Officer Hopwood had come into the room, as

8        well as, I believe, Officer Shipilov was in the

9        room.  Officer Shipilov was just standing, kind

10        of in the doorway, trying to figure out if we

11        needed other help.  Officer Hopwood then kind

12        of was holding Mr. Quinto's upper body down

13        while Officer Beccerra took over the figure

14        four lock so that I could -- so that I

15        could go complete paperwork that needed to be

16        done to get him transported to the hospital.'"

17        Does that refresh your recollection that

18   Officer Hopwood, after he entered the room, was holding

19   Mr. Quinto's body -- upper body down?

20   A.       Whatever's -- yes, sort of.

21   Q.       Okay.  Tell me how?

22   A.       So ultimately, I think that Officer Hopwood

23   got into a position to take over the area where Officer

24   Beccerra was, Beccerra took over my position, and then I

25   don't know that it was necessary to hold his upper body

153

**DEPOSITION OF OFFICER JAMES PERKINSON - VIDEOCONFERENCE**

1    down or not.  I -- I left the room.  I'm not sure what

2    took place.  But he was kind of in an area to take over

3    the position that Beccerra was in while I -- Beccerra

4    took over my position.

5    Q.        Is it a fair reading of your testimony that

6    you saw Officer Hopwood making physical contact with

7    Mr. Quinto's upper body, but you don't know whether or

8    not he was applying pressure with that contact?

9              ATTORNEY BLECHMAN:  Hold on a second.

10             It calls for speculation of whether it's a

11   fair reading of it; it's argumentative.

12             But go ahead.

13             THE WITNESS:  I do believe he touched him.

14   Whether or not he used much force to push him down, and

15   how long that force was -- I mean, I was exiting the

16   room, and then I was gone.

17             ATTORNEY NISENBAUM:  Q.  Okay.  But you

18   did see the physical contact; correct?

19   A.        I would have assumed that I saw it very

20   briefly.

21   Q.        Okay.  You don't just assume it; you know it,

22   because you testified to it under oath at the coroner's

23   inquest.

24             Correct?

25             ATTORNEY BLECHMAN:  It's argumentative.

154

1    guy with the glasses?  I paused at 7 seconds;

2    correct?

3    A.        I see this person.

4    Q.        Okay.  Continuing.

5              (Video file is playing.)

6              ATTORNEY NISENBAUM:  Q.  All right.  So

7    the guy with the glasses went in last; correct?

8    A.        It appears so.

9    Q.        So that is pretty much a different view of

10   the -- of the 11:25 P.M. clip that I just showed you

11   from the Ring video; correct?

12   A.        I believe so.

13   Q.        All right.

14             And obviously no sound from Mr. Quinto there

15   either.  Now, that would be, at least, 11 minutes --

16   about 11 minutes after you had initially entered the

17   room; correct?

18   A.        Sorry, I kind of lost track of keeping track

19   of the times, but.

20   Q.        Right.  The first video was time-stamped

21   11:13.

22   A.        Okay.

23             And this one was in the neighborhood of?

24   Q.        11:24.

25   A.        So doing the math, it appears that 11 minutes

161

1   would be accurate.

2   Q.        Okay.  Now, when you went back into the --

3   when you went back in -- back into the house, how long

4   had you been out of the house?  In other words, how long

5   were you out of the house from when you left to get and

6   do the paperwork to going back in?

7   A.        Honestly, I don't recall.  I mean, I can't

8   imagine it was more than a few minutes.

9   Q.        Okay.  So it was 11:20 when you left, though;

10  correct?

11  A.        I believe that's the video you showed me, yes.

12  Q.        Okay.  So now I'm going to go to 23:26 on the

13  Arlo videos, and that obviously represents 11:26.  It's

14  a 13-second clip.

15                  (Plaintiffs' Exhibit 12 marked

16                   for identification.)

17            (Video file is playing.)

18            ATTORNEY NISENBAUM:  Q.  All right.  Was

19  that you reentering?

20  A.        It was not.

21  Q.        Okay.

22            Do you know who it was?

23  A.        I believe it was Officer Shipilov.

24  Q.        Okay.  Go to the next Arlo, which is -2327.

25  //

                                                      162

DEPOSITION OF OFFICER JAMES PERKINSON - VIDEOCONFERENCE

```
 1                      CERTIFICATE OF REPORTER

 2

 3              I, DEBRA J. SKAGGS, hereby certify that the

 4     witness in the foregoing deposition was by me duly sworn

 5     to tell the truth, the whole truth, and nothing but the

 6     truth in the within-entitled cause;

 7

 8              That said deposition was taken in shorthand by

 9     me, a Certified Shorthand Reporter of the State of

10     California, and was thereafter transcribed into

11     typewriting, and that the foregoing transcript

12     constitutes a full, true, and correct report of said

13     deposition and of the proceedings which took place;

14

15              That I am a disinterested person to the said

16     action.

17

18              IN WITNESS WHEREOF, I have hereunto set my

19     hand this 5th day of May, 2023.

20

21                   /s/Debra J. Skaggs_____
                     DEBRA J. SKAGGS, CSR No. 7857
22

23

24

25
                                                         189
```