# EXHIBIT F

DEPOSITION OF OFFICER NICHOLAS SHIPILOV

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

MARIA QUINTO-COLLINS, et al.,)
                      )   CERTIFIED COPY
        Plaintiffs, )
                      )
        vs.          )CASE NO.: 3:21-cv-06094-VC
                      )
CITY OF ANTIOCH, et al.,    )
                      )
        Defendants. )
_____)   CERTIFIED COPY

(Pages 9 thru 14 are CONFIDENTIAL
SEALED and BOUND SEPARATELY)

DEPOSITION OF OFFICER NICHOLAS SHIPILOV

WEDNESDAY,  APRIL 19, 2023

10:12 A.M. - 12:47 P.M.

REPORTED BY:  KYLE RIDENOUR, RPR, CSR No. 14473

1

**DEPOSITION OF OFFICER NICHOLAS SHIPILOV**

1                          INDEX OF EXAMINATION

2

3     EXAMINATION                                          PAGE

4     BY MR. NISENBAUM                                        6

5

6                              --o0o--

7     Appearance Page                                        3

8     Exhibit Page                                           4

9     Location                                               5

10    Deponent's Signature                                 113

11    Reporter's Certificate                               114

12    Disposition                                          115

13    Witness Letter                                       116

14    Deponent's Changes/Corrections                       117

15    Attorney's Notes                                     118

16

17                              --o0o--

18

19

20

21

22

23

24

25

                                                            2

DEPOSITION OF OFFICER NICHOLAS SHIPILOV

```
 1                   A P P E A R A N C E S

 2

 3    For Plaintiffs:
           BURRIS, NISENBAUM, CURRY & LACY, LLP
 4         BY: BEN NISENBAUM, ATTORNEY AT LAW
           Airport Corporate Center
 5         7677 Oakport Street, Suite 1120
           Oakland, California 94621
 6         510.839.5200
           ben.nisenbaum@johnburrislaw.com
 7

 8    For Defendants:

 9         McNAMARA, DODGE, SLATTERY, BORGES & AMBACHER, LLP
           BY: NOAH G. BLECHMAN, ATTORNEY AT LAW
10         3480 Buskirk Avenue, Suite 250
           Pleasant Hill, California 94523
11         (925) 939-5330
           noah.blechman@mcnamaralaw.com
12

13    Also present:

14            Maria Quinto-Collins
              Robert Collins
15            Isabella Collins
              Daniel Hopwood
16

17                       --oOo--

18

19

20

21

22

23

24

25
                                                         3
```

1           INDEX TO EXHIBITS

2             NICHOLAS SHIPILOV

3

4     NUMBER       DESCRIPTION                        PAGE

5        1        Contra Costa County Fire Protection    65
               District Conversion Record
6

7                      --o0o--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        4

1  said that he did recall it; so I would assume there was

2  instruction on that.  But, again, I can't -- you know,

3  we're talking about 16, 17 years ago; so --

4      Q    Sure.

5          So one of the things I just said was about,

6  you know, your personal knowledge.

7      A    Right.

8      Q    So --

9      A    I don't specifically recall.

10     Q    Okay.

11         After the academy, at any of the police

12  departments that you've been employed at, did you

13  receive training around how to avoid asphyxiating people

14  during restraint?

15     A    Yes.

16     Q    Okay.

17         When's the first place you received that

18  training?

19     A    I don't recall.

20     Q    Was it -- do you recall being trained in that

21  subject at Santa Clara Police Department?

22     A    Yeah.  I -- again, I don't specifically

23  recall.  I remember specifically covering that topic at

24  Antioch Police.

25     Q    Okay.

21

DEPOSITION OF OFFICER NICHOLAS SHIPILOV

1    of the members of the defensive tactics team that led

2    the training?

3         A    I don't recall specifically which instructors

4    led the training.

5         Q    Okay.

6              How long was the training with respect to the

7    restraint asphyxia component?

8              MR. BLECHMAN:  It's vague and ambiguous.

9              But go ahead.

10             THE WITNESS:  For that specific topic?

11   BY MR. NISENBAUM:

12        Q    Yes.

13        A    I would guess between one and two hours,

14   maybe.

15        Q    Okay.

16             And that's your best --

17        A    Best estimate.  Correct.

18        Q    Thank you.

19             It was part of, I assume, a larger training.

20             Correct?

21        A    Yes.

22        Q    All right.

23             Was it part of your perishable skills

24   training?

25        A    Yes.

29

1      Q    And that's a training you have to have
2   completed a number of hours in every other year?
3      A    I believe that's the case, yes.
4      Q    Okay.
5      A    I'm not sure what topics need to be covered
6   and what topics can be auxiliary or whatever.
7      Q    Right.
8      A    I'm not familiar with the POST guidelines for
9   defensive tactics.
10     Q    That's because you're not an administrator;
11  right?
12     A    Yes, that's correct.
13     Q    You rely on them to give you the right
14  training; right?
15     A    Correct.
16     Q    Okay.
17          So talking about the principles that -- the
18  training that you did have regarding restraint asphyxia
19  at Antioch Police Department, can you tell me what you
20  learned generally about how to avoid asphyxiating people
21  during restraint?
22     A    The main topic of conversation as I recall was
23  alternatives to placing body weight on a detainee's
24  back.  Obviously avoiding the neck but even -- even
25  going so far as to avoid putting weight on the -- the

                                                        30

DEPOSITION OF OFFICER NICHOLAS SHIPILOV

1   subject's back.

2        Q    Okay.

3             What alternatives were you taught?

4        A    Side control with, like, a wrist lock was an

5   option.  If I recall correctly, they also focused on

6   controlling the hips instead of the torso.  That's as

7   best as I can remember.

8        Q    Okay.

9             Were you trained that prone restraint can be

10  dangerous?

11            MR. BLECHMAN:  Hold on.

12            Vague and ambiguous as to "prone restraint."

13            Go ahead.

14            THE WITNESS:  My understanding is that in

15  certain situations it can be, yes.

16  BY MR. NISENBAUM:

17       Q    Okay.

18            Do you understand the term "prone restraint"

19  since that objection was "vague"?

20       A    If you'd like to explain it to me --

21            MR. BLECHMAN:  It's a vague and ambiguous

22  question.  But --

23            MR. NISENBAUM:  That objection -- I'll restate

24  it.  How about this?

25            THE WITNESS:  Sure.

31

1    Q    Let me finish the question.

2    A    I'm sorry.

3    Q    You do have training that -- that interference

4    with parts of the body that would affect the rib cage

5    could impact the person's ability to breathe; correct?

6    A    Correct.

7    Q    And as you just said, that could -- that would

8    obviously include the diaphragm and the -- the parts of

9    the body that are connected to the rib cage; correct?

10   A    Correct.

11   Q    Okay.  Thank you.  All right.

12        I assume you've been trained in something

13   called a position of recovery.

14   A    Yes.

15   Q    What is that?

16   A    Laying somebody on their side after --

17   generally after, like, a carotid application or a Taser

18   deployment.  Just laying them on their side to allow

19   their, I guess, respiratory system to function better.

20   Q    Okay.

21        It's your understanding that putting a person

22   on their side -- I think it was referred to yesterday as

23   a fetal position.

24        Is that your understanding of a position of

25   recovery?

36

1    A    Not -- not exactly.  I mean, I could see how
2  they could be viewed similarly.  But as far as I can
3  recall, the recovery position would be on your side and
4  then, like, the top leg as you're laying on your side,
5  like, knee bent out a little bit just to give the person
6  some balance so you're not doing this teeter-totter kind
7  of thing.
8    Q    Right.
9    A    But to me, the fetal position is, like, the
10  knees tucked.
11    Q    I agree.  I'd never heard of it referred to
12  that way either.  So I didn't know if that's something
13  they did or --
14    A    We're on the sage page.
15    Q    I didn't know if that's something -- I didn't
16  know it that's how they referred to it at Antioch Police
17  Department or not; so --
18    A    I don't recall it being described that way.
19  But that's not to say it wasn't at some point.
20    Q    All right.
21        And the position of recovery as you understand
22  it is a position that allows -- the best position that
23  you would put an unresponsive person in to be able to
24  breathe; correct?
25    A    Say that again, please.

37

DEPOSITION OF OFFICER NICHOLAS SHIPILOV

1          A     No.   I was just -- off the top of my head, I
2   couldn't name any others.   If you would like me to try
3   and think of more, give me a couple of seconds.   I
4   probably can.
5          Q     Well, I'll just ask you the next question,
6   which is:   What other -- after what other actions or
7   activities are you supposed to -- are you trained to put
8   a person in a position of recovery?
9          A     Like, extreme physical exertion, like a
10   prolonged fight with police, perhaps, you know, after
11   the person is no longer combative.   That would be
12   appropriate.   I would say any kind of prolonged physical
13   exertion, you know, whether it's a long foot chase or a
14   car crash maybe even.   Something like that.
15          Q     And police are trained that you don't want to
16   leave a person on their back, for example, in a position
17   of recovery, because people can vomit, and they can
18   aspirate; correct?
19          A     Correct.
20          Q     So if you have them on their side, then if
21   they do happen to vomit or throw up, it comes out;
22   correct?
23          A     Yes.   That's how -- that's another aspect that
24   we're trained on.
25          Q     Okay.

                                                              39

**DEPOSITION OF OFFICER NICHOLAS SHIPILOV**

1           And you indicated that after physical exertion
2    such as a prolonged, I think -- what did you call it?
3    Prolonged combativeness?
4        A    Altercation I think is what I said.
5        Q    Okay.  Prolonged altercation.
6           That is one of the times when you're trained
7    to put a person in a position of recovery; correct?
8        A    When it's safe to do so, yes.
9        Q    Okay.
10          Are you required to leg shackle a person when
11   you put them in a position of recovery?
12          MR. BLECHMAN:  Incomplete hypothetical.  Vague
13   and ambiguous as to "required."
14          Go ahead.
15          THE WITNESS:  Leg shackle in terms of, like,
16   handcuffs for your ankles?
17   BY MR. NISENBAUM:
18       Q    Yes.
19       A    Are we required to?
20       Q    Yes.
21       A    Not that I'm aware of.
22       Q    Are you supposed to?
23          MR. BLECHMAN:  Same objections.
24          THE WITNESS:  I mean, it -- it's a
25   possibility, I suppose.  Supposed to -- it would be

                                                        40

DEPOSITION OF OFFICER NICHOLAS SHIPILOV

1    Q    Okay.
2         In any event, you put yourself on the call;
3    right?
4    A    Yes.
5    Q    Did you drive to the scene lights and siren,
6    code 3?
7    A    No.
8    Q    Why not?
9    A    I didn't feel it justified that level of
10   response.
11   Q    Okay.
12   A    There were two officers that were much closer
13   that would have got there well before me driving
14   normally; so --
15   Q    All right.
16        And how far away from Crestwood,
17   1707 Crestwood, were you when you attached yourself to
18   the call?
19   A    I want to say that prior call for service was
20   in the Saint Frances Drive area.  1 or 2 miles, maybe.
21   Q    Okay.
22        So you drove; right?
23   A    Yes.
24   Q    You got there; correct?
25   A    Yes.  Well, while we were responding, I

84

```
 1       Q     Okay.  All right.  It means handcuffed.

 2             Does it mean the incident is over?

 3       A     No.

 4       Q     All right.

 5             And I assume it was pretty quickly after that

 6  that the officers requested a WRAP.

 7       A     Yeah, relatively.

 8       Q     Within a couple minutes?

 9       A     I would guess less than that.

10       Q     Okay.

11             So you continued to the scene?

12       A     Yes.

13       Q     All right.

14             And what happened once you get to the scene?

15       A     Went inside the house.  Went to the bedroom

16  where they were located at.  I'm not sure if it's the --

17  like, the main bedroom or if it's a -- or not.  But I

18  looked in the doorway.  And officers were holding down

19  Mr. Quinto.  Officer Perkinson had Mr. Quinto in a

20  figure four leg lock.  And Officer Becerra I believe was

21  controlling his upper body.

22       Q     And how was he controlling his upper body?

23       A     To the best of my memory, I think he was,

24  like, either in a catcher's squat or kneeling on the

25  floor.  And then I think he was holding him down with
```

86

DEPOSITION OF OFFICER NICHOLAS SHIPILOV

1    his hands is what I believe my prior testimony was.

2         Q    Well, your prior statement said that

3    Officer Becerra was holding Mr. Quinto's chest down

4    while he was in handcuffs.

5         A    Okay.

6         Q    So --

7              MR. BLECHMAN:  Hold on.  Let's --

8              MR. NISENBAUM:  I'll play it.

9              MR. BLECHMAN:  Wait for a question.

10             THE WITNESS:  Sure.

11   BY MR. NISENBAUM:

12        Q    Does that -- is that consistent with your

13   recollection of what actually happened?

14             MR. BLECHMAN:  Assumes fact not in evidence.

15   May misstate portions of his interview.

16             You can respond.

17             THE WITNESS:  Yes.  It -- yeah.

18   BY MR. NISENBAUM:

19        Q    Okay.

20             And I'm -- you know, I want your best

21   testimony today; so I'm going to see if I can refresh

22   your recollection to make sure that it's clear.

23             I'll start at 11 minutes and 5 seconds of your

24   interview.

25             MR. NISENBAUM:  If you're able to transcribe

87

```
 1    this, that would be awesome.  It's not very long.  It's
 2    a little more than a minute.
 3              (Media played.)
 4              "A   -- really difficult to control.
 5              "Q   And he ultimately got transported away
 6               from that?
 7              "A   He did.  He got transported.  I don't
 8               remember which hospital.  But he was
 9               transported on a medical -- some kind of
10               medical issue.
11              "Q   So on this evening when you arrived,
12               are the officers already inside the house?
13              "A   Yes.
14              "Q   Okay.  So what did you do?
15              "A   Officer Hopwood and I actually pulled
16               up the street the same time.  And we went
17               into the house.  And when I walked in,
18               Angelo was on the floor in the -- in the
19               bedroom at the end of the hallway.  And
20               Angelo's mother was in there also with
21               Officer Perkinson and Officer Becerra.
22                  Then I saw that Angelo was handcuffed.
23               He was laying on his stomach.
24               Officer Perkinson was restraining his
25               lower body in, like, a figure four leg
```

88

DEPOSITION OF OFFICER NICHOLAS SHIPILOV

1      restraint.  And then Officer Becerra -- I

2      don't recall if he was kneeling on him.  I

3      don't believe he was kneeling on him.  I

4      think he was just kind of holding his

5      chest down.

6          But Angelo at that time was talking

7      incoherently.  But he was communicating.

8      And, you know, he wasn't making any, you

9      know, complaints about any kind of

10     difficulties that he was having with the

11     position he was in.

12  "Q   Okay."

13     MR. NISENBAUM:  I'll pause at 12:30.

14 BY MR. NISENBAUM:

15     Q   Does that refresh your recollection that

16 Officer Becerra, when you -- when you could see into the

17 bedroom, was holding Mr. Quinto's chest down with his

18 hands -- holding Mr. Quinto down against the ground

19 while he was laying on his stomach and in handcuffs?

20     MR. BLECHMAN:  May misstate the witness's

21 statement.

22     But go ahead.

23     THE WITNESS:  It's -- in the best of my

24 recollection, that is what I remember seeing.

25 ///

89

**DEPOSITION OF OFFICER NICHOLAS SHIPILOV**

1      A     Yeah.  Please.

2      Q     I'll play the last 30 seconds or so, last

3   45 seconds.

4            MR. BLECHMAN:  What portion of it are you

5   playing?

6            MR. NISENBAUM:  I'll start at 11:44.

7   11 minutes and 44 seconds.

8   BY MR. NISENBAUM:

9      Q     But no doubts that's your voice; correct?

10     A     Correct.

11           (Media played.)

12           MR. NISENBAUM:  Paused that at 12:29.

13   BY MR. NISENBAUM:

14     Q     So you don't think he was kneeling on him

15   per se, but he was holding his chest down; so that would

16   have been with his hands; correct?

17     A     That was my belief at the time the statement

18   was recorded, yes.

19     Q     Okay.

20           And that was based on your perception; right?

21     A     Yes.

22     Q     Meaning that's what you saw; correct?

23     A     Well, I can't say that fact- -- I can't say

24   100 percent that's what I saw.

25     Q     Okay.

                                                      91

1          Why not?

2     A     Because as you heard in the recording, I don't

3  specifically remember.  I believe that's what I saw.

4  There -- like I stated earlier, there are broad details

5  that are very easy to remember and then minutia that may

6  get blurry.

7     Q     Okay.

8          So you're saying that you believe you saw that

9  Officer Becerra was holding Angelo's chest down to the

10 ground with his hands, but you could be mistaken; is

11 that correct?

12         MR. BLECHMAN:  May misstate the witness's

13 testimony per his interview for that portion.

14         You can respond.

15         THE WITNESS:  Yes.

16 BY MR. NISENBAUM:

17    Q     Thank you.

18         And how long do you recall seeing

19 Officer Becerra in that position with respect to

20 Mr. Quinto?

21    A     Not -- I don't recall.  I know that at some

22 point while we were in the house, they were controlling

23 Mr. Quinto.  And I looked around in his room to see if I

24 could see any kind of, like, evidence of something that,

25 you know, could have chemically induced this behavior,

                                                        92

1   whether it's drug paraphernalia or medications so that

2   that information could be relayed to the medical staff.

3          So I wasn't standing in the door and

4   watching -- excuse me -- watching them the entire time.

5   But, I mean, I was only in the house for a few minutes,

6   I think.  So I don't recall if it was the entire time I

7   was in the house or at some point -- no.  Actually, I

8   take that back.

9          While I was in the house, they switched

10  positions also because Becerra moved down to his --

11  Mr. Quinto's legs, and Officer Hopwood controlled his

12  upper body.

13      Q    Right.

14      A    So from the time that I walked in the door,

15  time it takes me to walk down the hallway, and then

16  basically when I walked back out of the house, a little

17  bit before that.

18      Q    Okay.

19          So you think -- and let me just take a little

20  peek at my notes.

21          Did you leave with Officer Perkinson?  Did you

22  walk out with him?

23      A    Yes.

24      Q    Okay.

25          So I have here that at 23:17 and 13 seconds,

93

**DEPOSITION OF OFFICER NICHOLAS SHIPILOV**

1   you and Officer Hopwood entered.

2        A    Okay.

3        Q    And 23:20 and 17 seconds, you and

4   Officer Perkinson left.  So that's about three minutes

5   later.

6        A    Okay.

7        Q    So if that's three minutes, how long -- can

8   you estimate how long it was between when you -- well,

9   strike that.

10           You didn't see Officer Becerra put his hands

11   on Mr. Quinto's back.  Your recollection and your belief

12   is that he was already in that position when you got to

13   the -- when you were able to see in the room; correct?

14        A    Yes.

15        Q    Okay.

16           So you have no idea how long he'd been in that

17   position with his hands on Mr. Quinto's back; correct?

18           MR. BLECHMAN:  Calls for speculation and lacks

19   foundation.

20           But you can respond.

21           THE WITNESS:  I don't know how long

22   cumulatively he was in that position.

23   BY MR. NISENBAUM:

24        Q    Of course.

25           MR. BLECHMAN:  Can I pause you for a quick

94

1  different from the file names that I have that we got

2  that we produced.  So I'll alert you to that.  So I may

3  need your copies at some point.

4          MR. NISENBAUM:  I'll send those to you too.

5  Not a problem.

6          MR. BLECHMAN:  I understand.

7          MR. NISENBAUM:  Remind me.  Okay.

8  BY MR. NISENBAUM:

9      Q    All right.

10          So from the tame that you saw into the room,

11  into the bedroom -- you understood it was a bedroom;

12  correct?

13      A    Mm-hmm.

14      Q    So from the time you saw into the bedroom

15  where Mr. Quinto was located to the time when

16  Officer Hopwood switched with Officer Becerra, what kind

17  of time was that?  How long was that?

18      A    Well, if I was coming in -- the time frame

19  from entering the house to leaving the house was about

20  three minutes; correct?

21      Q    Right.

22      A    So you can probably take five to ten seconds

23  off of each end of that for travel to the doorway and

24  from the doorway and then enough time for Hopwood,

25  Becerra, and Perkinson to switch their positions.

96

1    Somewhere maybe between a minute and a half to
2    two minutes.
3        Q    Okay.
4            Meaning you believe that you saw -- your
5    observation of the period of time that Officer Becerra
6    was kind of squatting over Mr. Quinto with his hands on
7    Mr. Quinto's back, pressing him down on the ground,
8    would have been at least a minute and a half to
9    two minutes approximately?
10           MR. BLECHMAN:  Misstates the witness's
11   testimony.  Assumes facts not in evidence.  Misstates
12   the witness's prior interview statement.  Calls for
13   speculation.  Lacks foundation.
14           But go ahead.
15           THE WITNESS:  My best estimate is a minute --
16   90 seconds to 120 seconds.
17   BY MR. NISENBAUM:
18       Q    Okay.
19           And that's the time frame we're referring to,
20   what I just said in my previous question?
21           MR. BLECHMAN:  Asked and answered.  And my
22   same objections to his prior question.
23   BY MR. NISENBAUM:
24       Q    Go ahead.
25       A    Yes.

97

DEPOSITION OF OFFICER NICHOLAS SHIPILOV

1          Because when you talk, you're exhaling?

2     A    Right.

3     Q    And the whole issue with restraint asphyxia is

4  being able to inhale?

5     A    Right.

6     Q    Right.  So thank you.  All right.

7          So you said that Officer -- that

8  Officer Becerra moved to the figure four position at the

9  legs that Officer Perkinson had been in; correct?

10    A    Yes.

11    Q    Okay.

12         And what did Officer Hopwood do?

13    A    He took over control of the upper body.  But I

14  don't have any independent recollection of how that was

15  performed.

16    Q    Okay.

17         And is that because you essentially followed

18  Officer Perkinson out?

19    A    Yes.

20    Q    You turned around; right?  So you don't have

21  eyes in the back of your head?

22    A    No, I do not.

23    Q    Okay.

24         And what happened once you went outside with

25  Officer Perkinson?

99

1    A    We -- I don't remember exactly which order
2  this sequence was in.  But we went outside.  He -- he
3  looked for his 5150 form.  And I think I was just
4  sitting in my car at that time, maybe doing something on
5  the computer, checking pending calls for service.
6         And then he asked me if I had one because he
7  didn't have one.  And then I gave him the form, and then
8  a short time after that is when AMR arrived.
9    Q    Okay.
10        And that's when you communicated with the
11 paramedics?
12   A    Yes.
13   Q    And at some point, you went back inside;
14 correct?
15   A    Yes.
16   Q    Okay.
17        And when did you go back inside?
18   A    I don't recall if it was directly following
19 AMR.  But it would have been around the same time that
20 they went into the house.
21   Q    Okay.
22   A    It wasn't before then because I remember when
23 I went in the house, their gurney was already in the
24 hallway.
25   Q    All right.

100

```
 1              just kind of looking at him.  And -- and
 2              they noted that and immediately started
 3              CPR."
 4              MR. NISENBAUM:  Pausing as 16:37.
 5    BY MR. NISENBAUM:
 6         Q    Does that refresh your recollection about what
 7    you saw?
 8         A    Yes.
 9         Q    So can you describe what you saw?
10         A    Yes.  I walked into the house.  And the medics
11    were in the hallway discussing how to get him onto the
12    gurney.  They determined that they were going to use a
13    tarp with carry handles on it to pick him up.  They did
14    that and picked him up and put him on the gurney.
15         Q    Okay.
16              And in the recording, you said that Mr. Quinto
17    showed no signs of life.
18              What did you mean by that?
19         A    His body was limp.  His face had kind of a
20    blank stare, if I recall correctly.  His eyes were open
21    just staring but not moving.
22              I'm sorry.  I know this is difficult for you
23    guys to hear.
24              He had a little bit of blood on his mouth too.
25    Either his mouth or his upper lip or somewhere in that
```

103

**DEPOSITION OF OFFICER NICHOLAS SHIPILOV**

1          CERTIFICATE OF STENOGRAPHIC REPORTER

2               I certify that the witness in the foregoing

3     deposition, NICHOLAS SHIPILOV, was by me duly sworn

4     in to testify in the within-entitled cause;

5     that said deposition was taken at the time

6     therein named; that the testimony of said witness was

7     stenographically reported by me, a duly Certified

8     Shorthand Reporter of the State of California authorized

9     to administer oaths and affirmations, and said testimony

10    was thereafter transcribed into typewriting to the best

11    of my ability.

12               I further certify that I am not of counsel or

13    attorney for either or any of the parties to said

14    deposition, nor in any way interested in the outcome of

15    the cause named in said deposition.

16               The dismantling, unsealing, or unbinding of

17    the original transcript will render the Reporter's

18    Certificate null and void.

19               IN WITNESS WHEREOF, I have hereunto set my

20    hand this 1st day of May, 2023.

21

22

23    __/s/Kyle Ridenour____
      KYLE RIDENOUR, RPR
24    Certified Shorthand Reporter
      Certification No. 14473
25

114