# EXHIBIT P

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARIA CASSANDRA QUINTO-COLLINS, | ) | Civil Action No. C21-6094 AMO |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF ANTIOCH, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## Expert Report of John J. Ryan

1. My name is John Ryan. I have been actively involved in police practices and law enforcement since 1981. I was an active police officer for twenty years in Providence, Rhode Island. In the final year of my active career and since my retirement in June of 2002 from police services, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2. My education includes a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island; a Master of Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island and; a Juris Doctor Degree from Suffolk University Law School.

3. From 1993 until 2002 I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island. In that capacity I

1

was responsible for graduate courses on Constitutional Issues in Law Enforcement; Police Misconduct/Civil Liability; Managing Police Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law; and Business Crime.

4. I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, and Lou Reiter. In that capacity I author and edit the institute's legal update service for law enforcement. This update service and an archive of all articles that I have written can be found at and www.llrmi.com. Additionally, I provide multiple on-line video roll-call trainings annually for both the road and jail operations. This on-line roll-call series is a subscription service offered by the Legal & Liability Risk Management Institute.

5. As part of the Legal and Liability Risk Management Institute I also conduct policy, training and operations reviews for law enforcement agencies and jails throughout the United States. These reviews focus on the manner in which agencies treat the critical tasks in law enforcement and jail operations. As part of these reviews I assist agencies in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement and jail operations.

6. Since 1993, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, attorneys and judges. Training I have provided are detailed in my CV.

7. I am a former police Captain of the Providence Police Department in Providence, Rhode Island where I served for twenty years before retiring in 2002. During my tenure as a police officer I served in the following capacities: patrol officer in both the Patrol Division and the Tactical Unit; a detective in the Detective Bureau; a sergeant in the Patrol Division; a lieutenant in the Patrol Division; Director of Training; Director of the Department's Office of

2

Public Affairs and; Director of the Department's Administrative Staff.  During most of my career I also took an active role in researching and authoring department policy.

8.  Since my retirement in June of 2002, I have taught numerous courses on police policy and procedure, arrest, search and seizure, use of force, police pursuits, dealing with the mentally ill, emotionally disturbed, and suicidal, domestic violence, law enforcement's response to autism, law and best practices in the internal affairs process, civil liability for law enforcement agencies, and specialized courses for narcotics officers, SWAT commanders, and internal affairs officers.   Participants in these courses have come from thousands of law enforcement agencies around the United States.  Officers in attendance have come from departments with under ten sworn officers and departments with sworn officers numbering in the thousands. These programs are conducted numerous times annually throughout the United States and also include on-line courses on these topics for law enforcement.

9.  The course on policy and procedure focuses on critical tasks in law enforcement and includes, inter alia, policy issues relating to use of force; police pursuits; domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

10. The programs on High Risk Critical Tasks/Best Practices in Law Enforcement includes instruction on Use of Force including inter alia: dealing with individuals of diminished capacity i.e. emotionally disturbed, mentally impaired; and suicidal, excited delirium, as well as persons with disabilities and use of electronic control devices; Search-Seizure and Arrest; Pursuit and Emergency Vehicle Operation; Care, Custody, Control, and Restraint of Prisoners;

3

Domestic Violence; Off-Duty Conduct; Sexual Harassment, Discrimination, and Misconduct; Selection and Hiring; Internal Affairs; Special Operations; and Property and Evidence.

11.  As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies and jails relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, arrest procedures, care, custody, and control of persons with disabilities, and dealing with the mentally ill.  In addition, I write, record, produce, and distribute on-line training videos for law enforcement nationwide.

12. Since 2002, I have been involved in the auditing of law enforcement operations throughout the United States conducting several audits annually based on either a need or as a proactive measure of agency performance in the high liability areas of the road and jail operation.  I have been involved in assisting dozens of departments nationally through these audits in developing policy, training, and enhancing operations for law enforcement services.

13. My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

14. I have reviewed the following materials to date regarding this case: See Schedule D

15. This expert report is based upon the materials provided to this date. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States.

4

My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery. I recognize that there may be additional documentation as the case progresses. If additional material is produced, I shall be prepared to supplement this report.

16. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

<u>Deposition of Officer Arturo Becerra</u>

17. Becerra is currently a detective with the Antioch Police Department and has been a sworn police officer for four and a half years. (6).

18. Becerra acknowledged that he is a weightlifter and that his max squat is 425 lbs., and his max bench press is 350 lbs. (21-22).

19. Becerra acknowledged that he has been trained on avoiding asphyxiation during restraint. (23). Becerra testified as follows about his training: "I've been trained for asphyxiation, if someone was to go unconscious whether it's through -- in our policy through the Taser or the use of the carotid to put them in a recovery position to prevent them from asphyxiation." (24).

20. Becerra stated the following about if he has been trained to avoid putting his body weight in a position that would compress a person's torso while they're in a prone or restrained position: "It depends. But, yes, I have." (24). Becerra testified to the following about this training: "Obviously, you don't want to put your knee to someone's neck. You don't want to put it across their thoracic area, which is their spine, or their lower back. I've been trained to use prone

5

handcuffing techniques where there is application of pressure to shoulders and to the -- the left arm or right arm." (25).

21. Becerra testified to the following about if Quinto was suspected of a crime at any point: "In the beginning when we were first initially notified, yes." (32).

22. Becerra does not recall driving to the house on Crestwood Drive with lights and siren on. (35).

23. Becerra stated that he was not familiar with Quinto prior to this incident. (35). Becerra testified that he was not familiar with the address either. (36).

24. Becerra testified to the following about whether or not Quinto had taken drugs: "On my way there, dispatch had mentioned history of drugs . . . They just said, "history of drugs."" (36).

25. Becerra testified to the following about what efforts he made to find out what was happening when he arrived on scene: "As I walked up, I saw Ms. Collins in the driveway on the phone with the -- the hammer in her hand. And that gave me cues that there was something going wrong inside the house. And she directed me into the house before I was able to get to her." (37-38).

26. Becerra testified to the following about whether there was some indication that Quinto had attacked someone with a hammer: "Other than seeing the hammer, no." (38).

27. Becerra testified that he did not ask any questions of Isabella Collins. (41).

28. Becerra testified that Isabella Collins did not appear to be visibly injured. (42).

29. Becerra testified that he recalls hearing loud grunting from inside the house. (42).

30. Becerra testified to the following about if there was a report of any actual fight occurred: "Other than what dispatch had informed us, that Mr. Quinto was assaulting his mother. That was the only information that I had. So to answer your question -- . . . that's what I believed was happening." (43-44).

6

31. Becerra testified to the following about what happened once he went into the house: "I went in the house. Ms. Collins was with her back against the hallway. She still had the hammer in her hand. I asked her to put the hammer down. I continued down the hallway. And then I went into the bedroom where Mr. Quinto and Ms. Quinto were." (44). Becerra stated that Ms. Quinto did not have any apparent injuries that he could see. (44).

32. Becerra reported the following about what he saw: "Ms. Quinto and Mr. Quinto against the entertainment stand. Ms. Quinto was -- had her arms wrapped around him. And I believe he had his arms wrapped around her as well . . . From what I recall, I believe he was partially on his back facing towards her. So his back was slightly elevated. But he was partially facing towards her." (45-46). Becerra testified to the following about if anyone was punching anyone: "No. Nobody was punching, no." (47).

33. Becerra stated the following about Mr. Quinto's size: "I would estimate -- I'm not 100 percent sure -- probably about 5-7. Maybe 200 pounds." (47).

34. Becerra stated the following about what happened next: "I waited for Officer Perkinson to get into the room. And then once he got in the room, we had Mom slowly let go of Mr. Quinto. And I grabbed ahold of his, I believe, left arm. And then I did a prone handcuff technique. And I placed my knee on his shoulder blade. And then I rotated his arm to his lower back." (50).

35. Becerra testified to the following about if Mr. Quinto seemed like he was in an appropriate state of mind: "I -- I don't know what his state of mind was but -- . . . I knew he was pulling away from me, which is a form of resistance." (51-52). Becerra acknowledged that he has been trained to recognize people who are mentally impaired. (52). Becerra stated the following

about what side Mr. Quinto went on: "If I would have rotated his arm, it would have put him on his, I believe, left side." (53).

36. Becerra testified to the following about what happened next: "I grabbed ahold of his arm. And I brought it to his lower back. And then Officer Perkinson took control of his legs and grabbed his right arm and put it to his lower back." (53). Becerra stated the following about if this put Mr. Quinto into a prone position: "It put him in a prone position, yes," (53).

37. Becerra stated the following about whether it was about one minute from when he first made physical contact with Mr. Quinto to when the handcuffs were applied: "Approximately. Maybe more. Maybe less." (55).

38. Becerra was asked if he kept his left knee on the back of Mr. Quinto's left shoulder after he was handcuffed to which he responded: "Yes, for a short time." (55).

39. Becerra testified to the following about how long his knee was on Mr. Quinto's back-left shoulder after the handcuffing: "From what I remember, 30 seconds." (56).

40. Becerra stated the following about what he did to check on Mr. Quinto after he removed his knee from him: "I saw him yelling -- or heard him yelling. Sorry. I heard him yelling. And then I saw the rise of his back, which means that he was breathing, and the fall of his chest." (60). Becerra testified that he believes the ambulance was called before Officer Hopwood came into the room. (61-62).

41. Becerra testified to the following about if he ever thought Quinto was ever trying to attack him: "He was pulling away from me and resisting. So he wasn't trying to physically assault me, but he was pulling away from me." (66).

42. Becerra stated the following about if he had his knee on Mr. Quinto's shoulder for 20 to 30 seconds after he was handcuffed: "From what I recall, yes. It may have been a minute." (67).

8

43. Becerra testified to the following about if the restraint occurred for a period of about five minutes before the paramedics came in: "From what I recall, yes." (72). Becerra stated the following about what he was doing to check on Mr. Quinto during this time: "I was making sure that his chest was rising and falling as I was holding his legs in the figure four position." (72). Becerra stated the following about how long the restraint of Mr. Quinto lasted in total: "I don't have an exact time." (74). Becerra acknowledged that at some point a WRAP was requested and then the WRAP was cancelled. (74).

44. Becerra testified to the following about what term, "position of recovery" means: "It's when someone's laid onto their side. That's my understanding of it. It's when they're -- so if someone's deemed unconscious, like I said, whether it's through the form of a Taser or carotid, they're placed in a recovery position until they are to regain consciousness." (75).

45. Becerra testified to the following about what he did to determine whether Mr. Quinto was conscious: "I saw him breathing." (75). Becerra stated the following about what else he did to check on Mr. Quinto's actual consciousness: "As I had him the figure four position, I still felt tension in his legs." (76).

46. Becerra stated the following about if he knew that Mr. Quinto was already dead when the paramedics got there: "No. I did not know he was dead." (80). Becerra stated the following about his first indication that Mr. Quinto was dead: "When I rolled him over to the side. I noticed that his head was slouched." (80). Becerra stated that this was when the paramedics were coming into the room. (80).

47. Becerra stated the following about what happened after he noticed that Mr. Quinto's head was slouched: "The I noticed there was blood on the floor . . . So then I continued to call his name. And I began to do a sternum rub to get any type of reaction from him." (80). Becerra testified

to the following about if he actually recognized that Mr. Quinto was in medical distress before AMR arrived: "Yes."

48. Becerra stated the following about why he did not move Mr. Quinto into a recovery position when he was in a prone position: "Because I didn't know how he would respond because how he had been acting prior to that. He was still tensed up his legs." (85).

49. Becerra stated the following: "So the reason why I had him in the figure four was based off of everything that had happened prior. And I understand that you're asking that specific. But, yes, I kept him in the figure four while he was handcuffed to prevent him from kicking or hurting anyone else." (86-87).

50. Becerra stated the following about what Mr. Quinto was doing to move after Becerra put him in the figure four: "Like I said, when we switched positions from the figure four -- I don't remember which side Officer Perkinson had his leg over the other. But I remember when we switched positions, his legs were still tense, and he was still kicking." (97).

51. Becerra stated the following about how Mr. Quinto calmed down: "He started to calm down. He stopped yelling. And he wasn't, you know, yelling every couple -- couple seconds. That's when I believed when he started calming down." (106).

52. Becerra stated the following about checking for Mr. Quinto's pulse: "So there's different ways to check for a pulse. It's through the carotid, through the wrist. I believe I checked the wrist. I didn't check the carotid. Sometimes pulses go faint at the  wrist, and sometimes they're more prominent at the neck . . . So as I said, when I checked his wrist, I didn't feel a pulse; so I immediately pulled him out of handcuffs. And then before I could do anything else, the paramedics had brought out the lifting tarp, and I assisted them with putting him onto the lifting tarp." (110-111).

53. Becerra testified that he first saw the blood on Mr. Quinto's face when Mr. Quinto's was rolled over. (112). Becerra stated that he believes the blood was coming from Mr. Quinto's mouth. (112).

### Deposition of Officer Daniel Hopwood

54. Hopwood stated the following about the training he received on avoiding asphyxiation in the academy: "I don't think it was one specific, like, LTO or learning objective. I think it was just encompassed into defensive tactics when applying different holds or restraints." (12). Hopwood further stated the following about what he was taught in this regard: "To keep our weight off the neck, upper body for long periods of time." (12).

55. Hopwood stated that he was not familiar with Angelo Quinto and had never been to the house at 1708 Crestwood. (17-18).

56. Hopwood stated the following about the call he heard from dispatch: "It was a family dispute. She came out with – RP armed herself with a hammer, I believe." (28).

57. Hopwood testified to the following about what happened after he arrived at the same time as Officer Shipilov: "I follow him inside the house. And we can hear screaming. Down -- you go inside the door and make a right down a long hallway. It's the last room. The screaming was coming from that room. We go -- I walk up to the room. I see Becerra on the left side of Angelo Quinto, who's handcuffed face down on the ground; go to the bed in front of the center. And Officer Perkinson's got him in a figure four leg lock." (31-32).

58. Hopwood reported the following about Becerra's position relative to Quinto: "So he was at the shoulder. He was at Quinto's left shoulder, kneeled down. I'm not 100 percent sure if he had his weight on Mr. Quinto -- Quinto at the time." (32).

11

59. Hopwood stated the following about what happened next: "I moved some boxes from the hallway. Officer Perkinson asked if someone could switch out with him so he could do the 5150 evaluation form. I answered up and said I'll switch out with him." (38).

60. Hopwood further stated the following about what happened: "Okay. So the room is kind of confined; so Perkinson decides to switch with Officer Becerra cause it's easier. So they do that as I take over a position on Quinto's left shoulder." (38).

61. Hopwood testified that he had his left knee on the back of Quinto's left shoulder blade. (39). Hopwood testified that he held this position for an estimate 20 to 30 seconds. (39).

62. Hopwood testified that Quinto was screaming when he first arrived and then at some point Quinto stopped screaming. (41).

63. Hopwood testified to the following about how long he was in position at Quinto's left shoulder: "All right. So when I first took the position on his left shoulder blade, I stayed there approximately 20 to 30 seconds cause I didn't really know the scope of the situation, if he was actually fighting or not. Obviously he's a guy having a mental crisis. We've already got an ambulance on the way. So I realize he's not pushing up. He's still screaming, not squirming too much. So I go into a catcher stance, which is my left -- both of my feet are pinned on the ground, and my knees are up. My left knee is over his shoulder blade, not putting any pressure on it. I probably hold that for 30 seconds because that gets tiring real quick. And then I go to two knees on the ground." (42).

64. Hopwood described the following about how Quinto started to calm down: "Okay. Ever since I took the position, he's still screaming. Obviously, we don't want him to -- we just want him to calm down and cooperate with the situation. So we're just telling him to calm down with a soft voice, trying to get more information on his medical care, stuff like that, from Mom. She's

12

not aware of what he's taken, but he's possibly taken something. And then during that conversation and us telling him to calm down, he slowly calms his yelling." (45).

65. Hopwood testified to the following about knowing that Quinto's heart stopped at some point: "When I rolled him over, that's when I first noticed." (49).

66. Hopwood testified to the following about why he can be heard saying, "We gotta get him out of here.": "Cause AMR was already coming down the hallway. And so I'm preparing to roll him over. And I see the blood immediately. I tell Becerra, "We gotta get him out of here." He does the sternum rub. AMR's already at the threshold of the door. And they start getting a bag out. And I tell them, you know, "He was just awake" or something like that and "Do you have Narcan?" cause on the street that's usually what we deal with." (49-50).

67. Hopwood stated the following about when Quinto appeared to have voluntary movement: "When I had my knee on his shoulder . . . Just little wiggle. That's why I ended up getting off him. It didn't seem like he was pushing up or resisting us too much anymore." (60).

<u>Deposition of Officer Nicholas Shipilov</u>

68. Shipilov testified to the following about if he communicated to medical personnel at the scene that alcohol or drugs were involved: "I believe I told them that we suspected he had been using methamphetamine." (71). Shipilov further stated, "I don't recall if it was specifically "We know he's using meth" or if it was "We suspect he's using meth based on our prior history with Mr. Quinto." But I believe methamphetamine was discussed during our conversation with -- or during my conversation with the medics." (72).

69. Shipilov testified to the following about responding to this call: "Yes. I heard the initial call come out. And it was dispatched to two officers. And I decided -- I asked dispatch to add me to the call for service also. I'm a canine handler. And my thought was that a canine would be

13

a good tool to have on the scene if needed if there was a situation where it may be required."
(82).

70. Shipilov further stated the following about responding to the call: "Yes. Well, while we were responding, I remember the officers on scene saying that they – they didn't need any other assistance because he was detained. And then I cleared myself off the call at that point. And then somebody said over the radio that he was going to need to be placed in a WRAP, a restraint device. And then I asked dispatch to reattach me to the call." (84-85).

71. Shipilov stated the following about what happened when he got to the scene: "Went inside the house. Went to the bedroom where they were located at. I'm not sure if it's the -- like, the main bedroom or if it's a -- or not. But I looked in the doorway. And officers were holding down Mr. Quinto. Officer Perkinson had Mr. Quinto in a figure four leg lock. And Officer Becerra I believe was controlling his upper body . . . To the best of my memory, I think he was, like, either in a catcher's squat or kneeling on the floor. And then I think he was holding him down with his hands is what I believe my prior testimony was." (86-87).

72. Shipilov was played his prior statement that was transcribed and made part of the deposition where he said, "when I walked in, Angelo was on the floor in the—in the bedroom at the end of the hallway. And Angelo's mother was in there also with Officer Perkinson and Officer Becerra. The I saw that Angelo was handcuffed. He was laying on his stomach. Officer Perkinson was restraining his lower body in, like, a figure four leg restraint. And then Officer Becerra—I don't recall if he was kneeling on him. I don't believe he was kneeling on him. I think he was just kind of holding his chest down." (88-89). Shipilov then testified that to the best of his recollection the foregoing prior statement is what he remembered seeing. (89). Shipilov acknowledged his belief that Becerra was holding Angelo's chest down, using his

hands. (91). Shipilov said that Becerra's hands were on Angelo's back when Shiplov arrived so Shipilov could not say how much longer Becerra was holding Angelo down in this manner. (94). Shipilov said that his best estimate of how long Becerra was putting pressure on Angelo's back with his hands while was present was 90-120 seconds. (97).

73. Shipilov agreed after listening to his prior statement that things had de-escalated when he arrived at the house, which is one of the reasons he went back outside. (108). Shipilov acknowledged that he did not know whether there was ever a physical confrontation. (109).

<u>Deposition of Officer James Perkinson</u>

74. Perkinson testified to the following about what he learned in the academy regarding asphyxiation: "So what I remember from 23 years ago learning in the academy, asphyxiation issues would be that -- somebody who is having problems breathing, or whatnot, would be placed in what we call a position of recovery, which is typically to put them in a fetal position." (22).

75. Perkinson testified that he was involved in a previous incident with Quinto a few months before the incident that is the subject of this case. (28).

76. Perkinson stated the following about Quinto being transported to the hospital in the prior incident: "Mr. Quinto could not answer any questions. At that point we did not know what was going on with him. The first responders -- the ambulance people -- took him to Sutter Delta Hospital to be evaluated. If somebody is placed on a W&I 5150 hold, they would be transported to county hospital in Martinez . . . He was not placed on a hold." (29).

77. Perkinson further testified to the following about this previous call: "So ultimately under the Community Caretaking Act, he was taken to Sutter Delta to be evaluated. At that point it was unclear what his issues were, but he was unable to provide any information to identify himself,

where he lived, or anything that had occurred to him. But he did have some injuries to, I believe, his lower legs that when other officers initially contacted him, he was kind of hanging on a fence, I believe . . . I was the primary officer, as it was my beat that this occurred in. But at -- I was not the person that detained him initially; there were other officers that responded as well. They detained him, called for an ambulance, and I went because it's my ca- -- or my beat where this incident was occurring, so I went over there in case there was going to be a need for a police report." (30).

78. Perkinson testified to the following about whether Quinto told him he was using meth during this prior call: "After he was transported to the hospital, I went to the hospital. At the hospital, he was able to provide me with his mother's phone number. I called his mother; his mother was able to identify him. At that point it was believed it was a medical issue. In my speaking with Mr. Quinto, while he was being treated at the hospital, I believe he did tell me that he had used some methamphetamine. I left him there at the hospital to be treated by them, and when he was released from the hospital, I have no idea." (31).

79. Perkinson stated the following about the initial call that he received for the December incident with Quinto: "While in the parking lot at the Rite Aid shopping center, dispatch came over the radio and asked us verbally if we were able to clear for a priority call. They advised they had a subject screaming an address on the phone, who had disconnected, and they were calling back for more information." (91).

80. Perkinson stated the following about if he responded with lights and sirens: "I honestly don't recall because -- my recollection is it was actually a short distance away; it was a cold December night that there wasn't a lot of traffic out." (95).

16

81. Perkinson testified to the following about when he recognized that this was the location of the October call: "You know, I don't think it was until after everything had settled down. I don't -- I don't -- I don't independently remember exactly when I realized this might have been in the same area as the October call." (96).

82. Perkinson testified to the following about what happened after he followed Officer Becerra into the bedroom: "Myself and Officer Becerra separated the two parties and detained Mr. Quinto." (113).

83. Perkinson testified, "So when I entered the bedroom, the first thing that caught my eye were there were two subjects that were on the floor, kind of backed up to, like, an entertainment center." (113-114).

84. Perkinson continued, "What I recall was the mother was, I believe, in a seated position with her back against the entertainment center, and she was holding Mr. Quinto, who was kind of -- I don't know the best way to describe it -- almost -- his feet were out, kind of laying on the thing and he was kind of, like, leaning in on her, and they were -- what I'd describe was they were both bear-hugging each other, just holding on." (114).

85. Perkinson further described the following: "It -- just they were bear-hugging each other. They were holding onto each other. She was asking for help or something to that effect. I don't specifically recall what she was saying." (115).

86. Perkinson testified to the following about whether Quinto was saying anything: "I know he was making noises. And I want to say, like, as we first walked in, he made some comment about "Don't kill me." And then he might have even asked his mom or somebody "Don't let them kill me," something to that effect. I don't -- unfortunately, we didn't have cameras

17

recording at that time, so I don't specifically remember exactly. But it was something along those lines." (115).

87. Perkinson testified to the following about what happened: "We separate the two parties. The mom kind of falls back off to the side, but still with her back up against the entertainment center. At one point I grab handcuffs, I get a handcuff on his right hand, and I pull it to the middle of his back . . . I believe that Officer Beccerra was trying to manipulate his left hand to get it to the center of his back, and that took a little bit of a second, and then he was in handcuffs at that point. He continued to kick, so I held his feet down." (118).

88. Perkinson testified to the following about whether Quinto was trying to strike him, Becerra, or the mother: "I never felt like he was trying to assault anybody at that time." (118).

89. Perkinson stated the following about his physical contact with Quinto: "So during the four minutes or so that I was in there, I would say the majority of the time I did have some kind of physical contact with him." (119).

90. Perkinson stated that he does not recall Quinto being sweaty. (119).

91. Perkinson stated the following about how Quinto was separated from his mother: "The best way to describe it was we just kind of scooted her out of the way and just kind of rolled him onto his stomach . . . I think as they were separating, he basically went to the ground on his stomach with, obviously, myself and Officer Beccerra also guiding him." (120).

92. Perkinson stated the following about recognizing Quinto: "Shortly after he was handcuffed, I did recognize him. Shortly after he was handcuffed, I began conversing with his mother. We talked about the fact that I had talked to her before on the phone. I thought I had dealt with Mr. Quinto before. We discussed whether or not he was using drugs. She said she couldn't

confirm that, but suspected. I asked about mental health. She again couldn't confirm, but again suspected that there was some undiagnosed issue." (121).

93. Perkinson testified to the following about what Becerra was doing prior to the handcuffing: "Officer Beccerra was getting his left hand up to the back so that I could put a handcuff on him, and then I believe he was holding down his left shoulder." (121).

94. Perkinson stated the following about which knee Becerra was applying to Quinto's shoulder: "Trying to visualize what was going on, I believe it was his left knee that was on the left shoulder/more the back of the arm; I believe his right knee was actually on the floor." (125).

95. Perkinson stated the following about how long the knee was on the shoulder: "My belief that his -- what I recall of his knee being on the shoulder, was probably 30 seconds to a minute and, shortly thereafter, we changed positions." (126).

96. Perkinson testified to the following about how long Becerra kept a knee on Quinto after Quinto was in handcuffs: "Again, I think the whole time, from what I can recall, was maybe 30 seconds to 60 seconds that he had his knee on the shoulder. I could be mistaken. At some point my attention was with the mother trying to find out what was going on." (126).

97. Perkinson stated the following about if Becerra had his knee on Quinto's shoulder while Perkinson was talking with Quinto's mother: "I think at some point, yes, when -- as I began to converse with her, I know that his -- but then at that point my attention is turned and I'm talking to her, I don't know at what point he moved. And I'm not sure at what point Mr. -- Officer Hopwood walked in the room and, you know, at that point I'm -- once Officer Hopwood is in the room, we begin shifting locations, and I left the room." (129).

98. Perkinson stated the following about whether Becerra was kneeling on Quinto's left shoulder while Perkinson was applying a figure four: "Again, I'm unclear. I believe it's possible that he

did. When I'm holding the leg in the figure four, my attention is turned to the mother to try to get some facts as to what's going on." (135-136).

99. Perkinson testified to the following about when it was clear that there was no crime and that this was mental health issue or maybe intoxication: "Well, I would imagine that as soon as I determined that there was no crime, I was asking for the ambulance. Because the mom was describing possible mental health issues; the hallucinations. So when I'm asking for an ambulance, I probably have made the determination that this is a W&I 5150 situation and not an actual criminal investigation." (139-140).

100. Perkinson testified to the following about Officer Hopwood: "So ultimately, I think that Officer Hopwood got into a position to take over the area where Officer Beccerra was, Beccerra took over my position, and then I don't know that it was necessary to hold his upper body down or not. I -- I left the room. I'm not sure what took place. But he was kind of in an area to take over the position that Beccerra was in while I -- Beccerra took over my position." (153-154).

101. Perkinson testified that he made the call for the paramedics while he was still inside the room. (156).

102. Perkinson reported the following about where he was when the paramedics made entry: "I believe I'm in my patrol car trying to gain information for the required paperwork." (158).

103. Perkinson testified to the following about what he saw when he went back in the residence: "What I recall seeing was that he was -- Mr. Quinto was on a gurney and the paramedics were performing CPR." (164).

104. Perkinson stated the following about what he did next: "At that point I think I asked for the supervisor to respond, and then I got a recorder and began speaking with the mom." (164).

Deposition of Anders Clayton

105. Clayton stated the following about his crew on the night of the incident: "It's a crew of two, but I had what's called an intern, a paramedic student who had gone through the didactic portion and has to do his internship with what they call a preceptor, and I'm a preceptor. So, technically, we're still a crew of two because they're not licensed and whatnot. But I -- so I have to be there to observe everything that they do, and everything falls under my license. And we have to act as if there's just two people there because it's him and then what would be my normal partner. But it's still three people there present, an extra set of eyes and an extra set of hands." (10-11).

106. Clayton testified to the following about his understanding of why he was dispatched to the house: "The only information we get on what is called the psychiatric patients, or 5150s, is -- it just comes up 5150. And it usually says PD on scene, scene secure, that we can go in there. Or it will tell us to -- PD in route, the police department, and to stage. So we'll usually park a handful of blocks away and wait for the scene to be secured before we go in. I don't recall whether we staged on this call or not, to be honest, unless it's listed here. We got there real quick. I think we were cleared to go in." (18).

107. Clayton stated the following about whether his understanding is that the cardiac arrest occurred before he got inside the house: "Well, I don't. I don't because they, you know, didn't tell me that they were in cardiac arrest. Sometimes, you know, people are doing CPR already, the dispatch is giving instructions, and we get information telling us that a person is in cardiac arrest. So I didn't know that they were in cardiac arrest prior to my arrival. And all I can say is that they're in cardiac arrest the minute I identify them as in cardiac arrest. So it could have happened, you know, a minute or two minutes before, or it could have happened right there,

21

right in front of me when I did my -- but he was not awake when I made contact with him. So he would have been in cardiac arrest prior to my doing that assessment. Whether it was a few seconds or a minute or whatnot, I can't tell." (20-21).

108.    Clayton testified to the following about what the officer told him before he went in the house: "So they were outside, which is typical of these calls. There's an officer that is usually right outside, and they give us, like, a rundown of what's going on, and they direct us where the patient is, where to go . . . To the best of my recollection, that they had a patient that was going to be on a 5150 hold and was a danger to self or others; that they had a history of this patient prior; and they had a history of methamphetamine use. And I believe the last time they were out there they said he was jumping fences or on the roof or something like that and that -- the night, that he was combative; and he was inside the house; and he was being restrained by officers that were inside there with me. Or inside there with the patient. Sorry." (23-24).

109.    Clayton testified to the following about what he saw in terms of Quinto and the officers in the bedroom area: "The first thing I saw was, you know, that they were just right inside the room with the door open. And the patient, Mr. Quinto, was laying face down, his feet closest to me. Like, I was looking at him feet-first and then head a little bit further away. To the best of my recollection, I saw an officer that was kneeled down or squatting down and had Mr. Quinto's -- I believe, his left leg crossed over, like bent at the knee, crossed over behind his right leg. And then he -- the officer had his knee, like, right in the apex of those two crosses. And I think that's to prevent -- I've seen that before -- to prevent patients from kicking, you know, extend their legs. And then, of course, the patient was in handcuffs behind his back. He was face down with his -- again, one of his legs crossed over the other one. And there was another officer in the room. They were standing. And they -- I seem to recall them being, like,

22

at the -- towards the head of the patient, the other officer kneeled down behind the patient, and then I believe the mother was in the room to the right of us." (27-28).

110.    Clayton reported the following about what happened: "Yeah, yeah. We -- I believe the officer started telling the patient that we were going to roll him over. And, you know, we're taught to not, like, put hands on people at all in terms of, you know, when the officers are doing something. So they were going to roll him over because we needed to do assessment. We had to get the handcuffs off. But I do recall -- well, I watched the video. And I remember the officer, you know, telling him that they were going to roll him over. And I was expecting, honestly, at any moment for the patient to start kicking and becoming combative, and so I was on high alert. And so when they rolled him over and we got no response, they immediately had to, like, change gears and felt like we had more than just a psychiatric patient here . . . We had to get him out of the handcuffs. We can't have patients in handcuffs -- when we go to care for them like that. So we had to get him out of cuffs and onto his back and onto -- out to an area that we could, like, work on him. I recall, you know, us putting him on the tarp and getting him on the gurney and starting CPR on him." (31-32).

111.    Clayton recalled the following about what he saw when Quinto was rolled over: "I don't have a picture of it in my mind, but I recall from the statement that I gave to the officers that he had -- there was a small amount of blood on his face. And I'm not sure exactly where that was coming from. It wasn't an obviously grotesque injury that I could see that was gushing a lot of blood. It was a very small amount of blood. I wasn't worried that he was choking, you know, on the blood because it was a small amount, and it seemed to me that it was primarily, you know, minor blood loss and it was not actively bleeding." (34).

23

112.    Clayton testified that he believes he checked for Quinto's pulse after Quinto was put on

the gurney and Quinto did not have a physical pulse. (37-38). Clayton testified that he initiated

CPR after checking for a pulse. (38).

113.    Clayton stated the following about if CPR efforts were continued outside of the house: "I

-- yeah, you know, I don't recall whether we sat there. I believe we were just waiting for the

fire department to get there as well to help us, and we were just trying to establish an advanced

life support. A very fluid situation, and I mostly just go off training and protocol, you know,

using some discretion and making split-second decisions what's best for the patient. We don't

want to just load and go and take him to the hospital and not do anything and wait for the

hospital. So we have to do the things that -- I can't go by myself in the back of the ambulance

in cardiac arrest because I can't do everything, so I wait for the fire department to get there. I

think probably we were waiting for the fire department to get there, as I recall, working on the

patient. And then as soon as they arrived, then we took off to the hospital, and that way I can

take two of the firefighters with me. One of them is a paramedic, so we ended up with two

paramedics on scene and a firefighter and a captain and my partner." (38-39).

114.    Clayton stated the following about how he was told of the possible methamphetamine use:

"More of the possibility, that he had a history of methamphetamine use, that he was being

combative. And a person being combative, you know, using methamphetamines, they can

become combative. So being combative is kind of indicative of methamphetamine, but it

doesn't mean that they are using methamphetamine. It's just consistent with methamphetamine

use." (94).

<u>Deposition of Joseph Ulricksen</u>

115.    Ulricksen stated that he got his EMT certification in 1989. (14).

24

116.   Ulricksen stated the following about what he was dispatched for on the night of the incident: "The call came in for a 5150 and that -- in our notes, that the scene was secure. So it was clear for us to enter straight into the residence, straight to the house." (15).

117.   Ulricksen testified to the following about what happened when he got to the scene: "I'm driving. I pull up to the front of the residence. There's three police vehicles, possibly four. There was at least three. There was two officers that were outside next to their vehicles. It looked like one was writing some paperwork. And Anders and David were exiting the ambulance on the side where the police officers were. And the one police officer started to give them kind of just -- kind of what's going on, which is -- I mean, that's basic under any scene call that we get some information on what we have. And that's what happened." (15-16).

118.   Ulricksen further stated, "I didn't catch the whole conversation. When I -- I exited the driver's side and walked around the back. So I caught the tail end of the conversation. I did hear -- what I did hear is that the patient was inside the house. I did hear something about the back bedroom. I heard something about that there -- that there was some history of some methamphetamine use, and that was it. We got our gurney. At that point -- we were told that the patient was combative, so at that point those patients are probably going to go into restraints for their safety, and ours, of course, but for their safety. So we got our gurney and headed towards the house." (16).

119.   Ulricksen stated the following about what he saw when he approached the back bedroom: "Well, as we're rolling the gurney towards the back, I see -- I could not see the whole patient. I could see that the patient was lying face down in the bedroom, and I saw one officer kind of standing towards the -- his upper body, standing, and -- but that's all. That's all I saw. And I

25

did see that he was -- that he was on his stomach and that he was handcuffed. And then Anders and David proceeded farther into the room. I couldn't get much farther. It was a thin hallway. I couldn't get any farther in." (21).

120.   Ulricksen stated the following about an officer saying that Quinto had calmed down: "I did hear something about him -- that the officer had said that he had calmed down. I do remember those words." (24).

121.   Ulricksen further testified, "Well, I saw Anders -- Anders reach over and shake and shout, Hey, buddy, how you doing? or whatever, and he wasn't really responding. And I heard Anders say something, Let's get the handcuffs off. I was still maybe ten feet away from Anders, but I could still, you know, hear what was being said. And so they started to get the handcuffs off. And we got the tarp, started moving him. Anders says we have no -- . . . Yeah. Anders, when -- yeah, we got a tarp, and we rolled him over onto his back and checked for a pulse, and he had no pulse." (25-26).

122.   Ulricksen testified to the following about what happened when Quinto was on the gurney: "The -- Anders began compressions. I got the cardiac monitor. He was placed on the defibrillation pads. And so CPR was initiated, and we proceeded to the ambulance. I got on the radio and called for -- called for an engine, because, generally, on these Code 2 calls, it's just us. So I called for a fire crew as we were proceeding out to the ambulance." (27).

123.   Ulricksen stated the following about what happened when Quinto was brought outside: "Well, he was placed into the ambulance, and further resuscitation efforts were made. An IV was started. You know, medications were prepared. CPR was continued. The fire crew got there. He was placed on a Lucas device, which does a mechanical compression. And then we proceeded to the hospital." (28-29).

26

124.    Ulricksen stated the following about Quinto's pulse was ever regained: "There was no pulse regained during – while he was in our care." (30).

125.    Ulricksen stated the following about what he overheard the officer saying about methamphetamine use: "I remember the officer saying that he did have a history of methamphetamine use and that they were out -- going a little bit farther, that they were out a couple months prior, that there was some methamphetamine use there, that he was climbing the fence and he was on the roof and doing some things. But they did have prior contacts with him, and there was some methamphetamine involved. So that was – that information was given to Anders." (57).

Deposition of Isabella Collins

126.    Collins stated the following about how long it took the police to show up after she called 911: "Maybe two minutes. I think it was -- it was really -- really, really fast. It was maybe a minute after the second call. I don't remember. It was fast." (96). Collins stated the following about making two 911 calls: "Yeah, I think it was disconnected after the first call and then I was called back." (96).

127.    Collins testified to the following: "I really just went to the hallway. I still didn't see my mom and brother. Excuse me.  They were in the bedroom, but I was in the hallway. And then when the officer passed me, I believe that's when I put the hammer on the couch. So I went backwards towards the couch, which is right next to -- or I guess it's sort of -- sort of perpendicular to the entrance." (107).

128.    Collins stated that once officers entered they went to her mother's bedroom. (111).

129.    Collins stated the following about talking with officers: "don't think it was before. They at least had a view of what was happening in the bedroom, which I hadn't had. So they probably

went in already and saw it. Because that's when they told me -- or they asked me who was the call even for because it looked like my -- "Was it your mom or your brother because it looked like your mom's in control here." And then they started, you know, sort of lightheartedly saying, "Oh, mom's strong." So, yeah, they had told me what the position what was and what -- what was going on in the bedroom before -- I think before the -- maybe during their -- maybe at the beginning of the restraint, but maybe before the restraint. I think before the restraint. You know what, I'm not going to get into that because I don't know. But they certainly did, you know, make it a point to ask me who the call was for and let me know that my mom was in control . . . So they asked whether it was actually a  call for -- to deescalate my mother's actions or something." (112).

130.    Collins stated the following about if she saw how the officers got her brother onto his stomach in the bedroom: "I don't believe so, no." (113).

131.    Collins testified to the following about seeing her brother on his stomach: "Yeah. And I think -- you know, what I am clear on is that I did see him facedown. And that -- that was very brief because -- and it was just -- it was the smallest sight, too, just because there was an officer whose body was taking up the doorway. So that was obstructing my vision. And also, for the most part, I just wasn't  really looking. I was just kind of trying to stay out of the way." (114).

132.    Collins stated the following about if she was able to see her brother from where she was: "No, I had the briefest glance of him once, but -- okay. So first of all, my view of the entire thing was very brief in itself. And just a microsecond of that was me being able to actually see him facedown." (116).

133.  Collins stated the following about when she next looked in the bedroom: "It was all -- it
was all very --  relatively short time span, so I probably looked once or twice more but could
only see an officer obstructing my vision. So just saw the back. And again, it's a big person,
so you can't really see anything. And then my -- my -- my next course of  action was to
communicate with my father and make sure that my cat wasn't leaving the house." (117).

134.  Collins testified to the following about what she heard that she thought was inappropriate:
"I mean more in response to you saying inappropriate. But I do get the sense that it was -- you
know, parts of it were inappropriate, especially sort of more in context. The main things that
I heard were my brother, you know, saying, "Please don't kill me, please don't kill me." And
an officer responding, "We're not going to kill you." I also remember hearing that this was a
mental health call, that he wasn't going to go to jail. And I think something that really stood
out to me, but I just was so -- I was -- I was foggy about it in that exact moment, but -- was
they said, "This is what we do to calm them down."  And I, for some reason in my head, I was
just kind of thinking are they giving him a bull tranquilizer or something, which is, you know,
it's completely ridiculous, but I was just, like, what could possibly be done that has -- requires
him on his face or his stomach. To calm him down. And I don't know. I didn't really address
that so much. But I remember just being sort of offput by it and confused by it. But that was,
I think, probably the -- the bigger thing that stands out to me as inappropriate, too." (127-128).

### Deposition of Maria Quinto-Collins

135.  Quinto-Collins stated the following about what happened with her son during the October
2020 incident: "We were -- we were in Daly City and Angelo, you know, stayed at home. He
was I believe taking the recycling out that night. And we just moved into that house. So, you
know, we're -- we were not very familiar with the way the knobs were.  I guess you can go

29

out but you can't come back in if you did not unlock it from the other side, from the inside. So when he went out, you know, he got locked out of the house. And, yeah, he started freaking out, I believe. And I did not know anything about it until later on in the night when my Arlo went off and I saw that there were -- there was a police car in front of the house. And that's when I'm like what's happening, why is it in front of the house. So I told my son Andre let's go home, you know, let's see what's happening." (71).

136.    Quinto-Collins further stated the following about the October 2020 incident: "No. Actually I -- on our way home the officer -- you know, I got a call from a police officer, Officer Perkinson. And he told us that, you know, he -- that they -- they brought Angelo to the hospital and if, you know, I -- I can pick him up at the hospital . . . But that was -- that was -- you know, it wasn't -- they didn't really explain what and why. So I said thank you, and we went to the hospital and picked him up, but they -- you know, at the hospital they said he's not ready to leave, he's under -- I don't know -- observation or something, that we can pick him up, you know, 2, 3 o'clock in the morning, something like that, in six hours." (72).

137.    Quinto-Collins stated the following about what happened between her and Angelo once she got in the bedroom on the night of the December incident: "She -- he was still -- you know, he was still grabbing, clutching both Isabella and my arms together and telling us not to leave, you know, "What's happening, what's happening."" (108).

138.    Quinto-Collins testified further, "Yes. So why -- you know, I was trying for him not to leave me, not to leave the room and just be with me. So we fell on the floor. He was on top of me and I put him on a bear hug. His head was on my shoulder and that's how we were, you know, the whole time." (109-110).

30

139.    Quinto-Collins stated the following about what the officers said: "Actually when they saw us, one officer said "Who was the call for? Was it your -- was the call for your brother is restraining your mother or your  mother is restraining your brother, cuz it looks  like your mom is in control?"  And they even chuckled. They laughed, "Mom strong."" (113).

140.    Quinto-Collins stated the following about how the officers got Angelo on his stomach: "They took him from me . . . From that position they took him and they put him down on the floor . . . His handcuffs – handcuffed him . . . Crossed his legs. You know, they crossed his legs like this and held it in that position . . . Crossed his legs and pulled it up to his back . . . One officer was holding him there, and the other officers kneeled – was kneeling on the back of his neck, right here." (113-114).

141.    Quinto-Collins stated the following about if it was a few seconds to get her son on his stomach and into handcuffs: "That's accurate. The question is why did they need to do what they did? Why did they need to cross his legs and kneel on the back of his neck?  That's what I don't understand. You know what they said when they did that? "This is what we do to calm him down." He was calm. He was calm. I did not understand why they had to do that. But they just did them. They just did them so much. They didn't say anything. I tried -- I tried to get their attention.  I told them "Is he asleep?" They didn't do anything. They didn't say anything." (116-117).

142.    Quinto-Collins stated the following about if she saw the officers hit her son: "No, nothing like that. He was very calm. There was no struggle, nothing. Nothing like that.  There was no struggle, no fighting, no resistance. That's why I don't understand. I'm trying -- I'm trying to understand everything." (117).

143.    Quinto-Collins stated the following about when she started recording this incident: "Yeah. Actually, you know, yeah. When they took him from me, I asked Isabella right away to get my phone and she brought it to me and, you know, right after I turned it on and sat down on the bed." (119).

144.    Quinto-Collins stated the following about the officer putting Angelo's leg in a sort of crisscross position: "Handcuffing while -- you know, they handcuffed him, and after handcuffing him one officer crossed his legs and put it up like, you know, being hog-tied and kept it at that position, while the other officer was on the back of his neck." (121).

145.    Quinto-Collins testified to the following about how one of the officers was positioned: "No. He was using his -- you know, the knee and the -- what do you call -- the shin part? Is that shin? You know, like kneeling. He was in a kneeling position." (122).

146.    Quinto-Collins stated the following about how long the officer was in the kneeling position: "The whole time, actually. Actually he got tired. He stood up and the second set of officers - - second set of responders, the one officer said, "Oh, what are you doing?"  "Oh, I'm tired, you know." "Let me replace you." And that other officer did the same position." (121-122).

147.    Quinto-Collins testified about how long the officers were in contact with Angelo's upper back area: "It was the whole time he was there. And if you look at the video, all the video, that's how long. From the very beginning to when you're hearing that the paramedics arrive, that's how long they were on Angelo. That's how long the position was." (124).

148.    Quinto-Collins stated the following about when Angelo stopped moving: "They -- they were -- they were on top of him at that time. They had him, you know, restrained already when I saw that he wasn't moving, that -- when I asked them if -- if he was asleep." (130).

149.   Quinto-Collins testified to the following about how many officers she saw in physical contact with her son at one time: "Two the first time, you know, and then the second time when the other officer replaced the one who was kneeling on the back of his neck." (130).

150.   Quinto-Collins testified to the following about whether any officer was still in contact with the upper-body of her son when the paramedics arrived: "When the paramedics arrived, when they knew that the paramedics were arriving, that's when they -- that's when he stood up, and the other one also let go of Angelo's legs -- I mean the position,  because the paramedics were coming, and that's when  they flipped him over too, you know." (131).

151.   Quinto-Collins stated the following about when Angelo was handcuffed: "They put him down. They put his hands to his back and handcuffed him and then pushed the leg -- crossed his leg, pushed it towards his back and then the handcuff first." (206).

152.   Quinto-Collins stated the following about the last grunting sound that she heard from Angelo: "When -- after he was -- I mean as soon as they handcuffed him, he did the disgruntled sound, you know, and that was it. And then I asked them if he was asleep." (207).

153.   Quinto-Collins stated the following about if she saw any resistance from her son while he prone face-down during the four-to-five-minute period: "No, no. Resistance, no resistance at all from him. No resistance. No resistance." (210).

<u>Deposition of Andrei Quinto</u>

154.   Quinto stated that he was not at home during the incident. (13). Quinto stated the first time he became aware of this incident was when he was questioned by two detectives in the early morning of December 24. (14).

155.   Quinto stated that he was area of an incident in October of 2020 where his brother was 5150'd. (32).

33

156.  Quinto stated the following about if he is aware of his brother using methamphetamine: "My brother is a lot of things, but methamphetamine is not one of them." (33).

<u>Deposition of Robert Collins</u>

157.  Collins stated that he was not at the Crestwood Drive address on the night of the December 23rd before Angelo was taken away by ambulance. (13). Collins stated that he was at his residence in Berkeley, California. (14).

158.  Collins testified to the following about receiving a phone call from his daughter: "What did she say in that phone call? I don't know that I remember the details. That maybe the police were there, that, you know -- you know, I don't know that I remember the details. I remember Angelo -- you know, something with Angelo. And then she sent me a text that said that he was purple, telling me that his condition was just really horrible or something like that, I mean, just – she would never use those words. She would be -- you know, but -- but, basically, that the police were there, there had been some incident at the house, and I understood that Angelo was -- was not well as a result of it." (15).

159.  It is my opinion, based upon my specialized background, education, training and experience as well as my continued research, authoring, auditing, consulting and training on law enforcement practices nationwide that the use of force/restraint used on Angelo Quinto by the involved officers was contrary to generally accepted policies, practices, training, and industry standards.  It is also my opinion that any officer who was present during this event had a recognized obligation in accordance with law enforcement policies, practices, training, and legal mandates to intervene in the force which was taking place.

160.  There are several basic concepts that are trained to officers throughout the United States and must be applied to any law enforcement use of force.

161.     Officers throughout the United States are trained in various formulas with respect to use of force decision making and justification. The first of these formulas is a three-part test which parallels the mandates announced by the United States Supreme Court in *Graham v. Connor.*[5] The three-part test directs officers to consider the seriousness of offense; whether or not the subject poses a physical threat to the officer or anyone else; and finally, whether the subject is actively resisting or attempting to evade arrest by flight.

162.     Here, while officers believed that an assault may have occurred, Becerra reported that he did not obtain any further information from Ms. Collins, who was outside when he arrived at the scene. Both Becerra and Perkinson reported that Ms. Quinto and Angelo Quinto were in a bear-hug type hold. Becerra, who got to the room first testified that he took no steps to intervene between Ms. Quinto and Angelo until Perkinson got into the bedroom. Perkinson said that he called for the ambulance when he determined that this was a mental health issue. Thus, based on the testimony of Becerra and the testimony of Perkinson, it was never determined that any crime had been committed by Angelo Quinto and it was determined that the event was a mental health encounter.

163.     In dealing with proper levels of force and the assessment of physical threat several factors are considered to include: Officer/Offender size and ability; number of persons present i.e. number of deputies versus number of hostile subjects; availability of weapons; environment; and threat to third parties. It is noted that California POST Learning Domain 20 on use of force specifically cites factors such as the availability of assistance i.e. the number of officers present and the availability of backup units as factors with respect to an officer's consideration on force.

164.     There is no indication that once the officer separated Ms. Quinto and Angelo that

Angelo posed any threat to the officers. Perkinson testified to the following about whether Quinto was trying to strike him, Becerra, or the mother: "I never felt like he was trying to assault anybody at that time." (118). It is noted that numerous officers responded to the scene and some, like Perkinson moved outside to do paperwork while Angelo Quinto remained in a handcuffed prone position, with his legs held in a figure four inside the home.

165.    There is also no indication that Angelo was resisting an arrest or evading arrest by flight. It is noted that Becerra reported that he could feel tension on Angelo's legs while in the figure-four and tension in his arms when handcuffing.

166.    It is noted that Becerra agreed that Angelo Quinto was handcuffed within a minute, maybe more, maybe less from Becerra's first contact with him. Based on the materials, it is clear that Quinto remained in the handcuffed prone position until the arrival of EMS. Becerra stated the following about his first indication that Mr. Quinto was dead: "When I rolled him over to the side. I noticed that his head was slouched." (80). Becerra stated that this was when the paramedics were coming into the room. (80).

167.    I would note that law enforcement training recognizes that use of a figure-four restraint on a prone handcuffed prisoner is tantamount to a hog-tie, is extremely dangerous, and is considered maximal restraint.

168.    Officers throughout the United States are trained on the concepts of positional asphyxia, compression asphyxia, and mechanical asphyxiation as the three relate to the restraint process. Positional asphyxia includes leaving a person in a prone position (on their stomach) while restrained. Officer are instructed to get such persons off their stomach as quickly as possible once there subject is restrained or when there are a sufficient number of officers present to minimize danger from the subject if he or she is not yet restrained.

Compression asphyxia as identified in law enforcement refers to putting weight or pressure on the back of a subject's torso while they are in a prone position. Even when subjects are kicking, officers are instructed to move the subject to a side position, stacking their legs and stabilizing the lower legs so kicking does not occur. Here, in terms of law enforcement training there was the danger of both positional asphyxia due to the handcuffed prone restraint and the figure-four hold, as well as compression asphyxia based on the weight being placed on Angelo Quinto's shoulder for a period of time after handcuffing was accomplished. As noted by Becerra he had his knee on Angelo for anywhere from 20 seconds to a minute after handcuffing. Hopwood testified that he replaced by Becerra and he estimated that he had his knee on Angelo's left shoulder for an additional 20-30 seconds. Perkinson estimated that Becerra's knee was on Angelo Quinto's shoulder for 30 seconds to a minute before positions were changed.

169.      In addition, Shipilov testified to his observation that Officer Becerra, wo in accord with his testimony is extremely strong, was placing pressure on Angelo's back using his hands for a minute and half to two minutes from the time Shipilov arrived until the time the officers changed positions on Angelo. Shipilov did not know how long, prior to his arrival, Becerra had this pressure on Angelo's back which was holding Angelo's chest down.

170.      Here, the prone restraint, which lasted until EMS arrived at the scene was estimated by Becerra to be five minutes. Angelo Quinto was mechanically restrained in handcuffs within the first thirty seconds to a minute after the officers separated he and his mother. Angelo was also held in maximal restraint during this time through the use of a figure-four technique. Based on these factors alone the officers restraining Quinto were acting contrary to generally accepted law enforcement policies, practices, training and industry

37

standards recognizing the danger of prone restraint and the steps that officers need to take to overcome these dangers.

171.    The steps trained to officers include not placing pressure on the back, neck, or head.  To avoid the shoulders unless necessary due to the inability to control a violent subject and when necessary to remove all weight once handcuffing is accomplished.  Officers are further instructed that once handcuffing is accomplished to move the person to a rescue position that facilitates breathing.  All rescue positions include getting the person out of a prone position so that no weight is on their stomach.  The most commonly taught rescue positions are an seated upright position or placing the subject on their side.  When dealing with a subject who is still offering voluntary or involuntary resistance, officers are taught that the side-position, allows the officers to stabilize the subject on the ground.  As noted, where it is necessary to control the legs, the legs can be stacked and stabilized with body-weight at a point on the leg that does not impact the persons torso.  Becerra said he did not move Angelo to a recovery position "Because I didn't know how he would respond because how he had been acting prior to that. He was still tensed up his legs." (85).  This could have been simply addressed by using the common tactic of a side recovery position and the stacking of the legs.  More importantly, law enforcement recognizes that the failure to utilize the recovery position may lead to death. Since there was never any assaultive conduct by Angelo observed by the officers it is unclear what response Becerra was fearful of.

172.    The second formula was the "Use of Force Continuum."  While agencies utilized different force continuum models, all of the models recognize that officers have various subject control tactics available to them and that these tactics range from a low-level intrusion, such as officer presence and verbal commands, to the highest level which is deadly force. It should

be recognized that even in those agencies which still use of force continuum, the continuum is not a ladder which must be climbed step by step. Instead, it is a presentation of various force options, each of which must be objectively reasonable under the circumstances with which the officer is faced. It is noted that due to confusion over application of such continuums, law enforcement is moving away from this concept and simply train "force options." It is recognized that many law enforcement agencies are moving away from the so-called "continuum" and moving toward a "Graham" decision making model.

173.    Law enforcement is well aware that officers will come into contact with persons suffering from impairments relating to mental illness, substance abuse, alcoholism and medical impairments. In any use of force instance where the officer has such information, additional factors and options should be considered. Law enforcement training throughout the United States recognizes that officers are often called to deal with persons who are emotionally disturbed or mentally impaired. Officers are trained to recognize such persons and utilize an approach which de-escalates the event. One of the common principles trained to officers is that persons who are in this condition may be provoked by certain law enforcement conduct to include aggressive commands, closing on the subject's personal space, or touching the person. In training these are often referred to as triggers which may escalate the event. Law enforcement agencies throughout the United States direct officers through policy and training how such persons should be approached and dealt with in order to avoid escalating the event.[8]

174.    As with the other law enforcement practices discussed in this report, California POST has a learning domain covering the topic of Persons with Disabilities which is consistent with the generally accepted policies, practices, and training nationwide. For example Learning Domain 37:4 instructs officers: Move slowly; When possible eliminate emergency lights and

39

siren and disperse any crowd that may have gathered; Assume a quiet nonthreatening manner when approaching. and conversing with the individual;  If possible, avoid physical contact if no violence or destructive acts have taken place; If possible, explain intended actions before taking action; Take time to assess the situation; Provide reassurance that officers are there to help; and Give the person time to calm down."

175.        Here, based on the materials there is some indication that Ms. Quinto had some control over Angelo at the time the officers arrived.   This control gave the officers time to slow down and reduce the intensity of the event rather than immediately separating the parties and then immediately going hands on with Angelo Quinto.

176.        At this stage of my review, I do not know if I may be asked to review additional documents.  Should I be asked to review any additional documents, I will be prepared to render additional opinions or supplement the opinions stated within this report.

177.        At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

178.        My fees for these professional services are outlined in the attached retainer agreement.


This report is signed under penalty of perjury on this 30th day of  June 2023, in Greenville, R.I.

s/*John J. Ryan*
John J. Ryan

40