1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7 | MARIA CASSANDRA QUINTO-
COLLINS, et al.,

Case No.  21-cv-06094-AMO

8
Plaintiffs,

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT; DENYING IN PART
PLAINTIFFS' CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT**

9
v.

10 | CITY OF ANTIOCH, et al.,

11
Defendants.

Re: Dkt. No. 62, 66

12
13

14        This case arises out of the December 2020 death of Angelo Quinto following a 911

15  response from City of Antioch Police Officers James Perkinson, Arturo Becerra, Daniel Hopwood,

16  and Nicholas Shipilov.  Plaintiffs Maria Cassandra Quinto-Collins, as successor-in-interest to her

17  son, Angelo, and Isabella Collins, Angelo's sister, filed a civil rights action under 42 U.S.C.

18  § 1983, asserting federal constitutional claims and related state law claims against the City of

19  Antioch, Chief of Police Tammany Brooks, and Officers Perkinson, Becerra, Hopwood, and

20  Shipilov.

21        Pending before the Court are Defendants' motion for summary judgment, Plaintiffs' cross-

22  motion for partial summary judgment, and Plaintiffs' three Daubert motions to exclude evidence.

23  Having considered the parties' papers, the relevant legal authority, and the arguments advanced by

24  counsel during the hearing on the matter, the Court GRANTS IN PART AND DENIES IN PART

25  Defendants' motion for summary judgment and DENIES Plaintiffs' cross-motion for partial

26  summary judgment on the excessive force claim.  The Court will resolve Plaintiffs' cross-motion

27  for partial summary judgment as to the issue of causation, and Plaintiffs' related Daubert motions

28  to exclude evidence, by separate order.

I.      **BACKGROUND**

      A.      **Factual Background**

           1.      <u>Undisputed Facts</u>

On December 23, 2020, at approximately 11:10 p.m., Isabella called 911.  ECF 62-1 at 27-71 (Maria Dep. 105:5-10, 109:5-16); ECF 62-1 at 73-142 (Isabella Dep. 98:4-99:3); ECF 62-1 at 146-155 (Antioch Police Department Event Report at APD 000162).  She screamed "stop," yelled her home address, and said "my brother is being aggressive."  ECF 62-1 at 143 (911 Call at 0:01-0:20).  The call then disconnected.  *Id.* at 0:24.

When the dispatcher called back, Isabella said that her brother was being aggressive, hurting their mom, and physically restraining her.[1]  911 Call at 0:30-1:06.  The dispatcher asked Isabella if Angelo was strangling her mom; Isabella said, "yes, he's strangling her."  *Id.* at 2:51.  Isabella said she took a hammer because her brother was "grabbing for it."  *Id.* at 1:34-1:45.  When the dispatcher asked whether Angelo took drugs, Isabella said "yes."  *Id.* at 2:03-2:05.  "Please help, please help, please help," she said, between yelling at her brother to "stop it."  *Id.* at 2:46-2:50; 3:00-3:03, 3:10-3:12.

The dispatcher gave officers the following information:[2]  A female called screaming an address and hung up.  ECF 62-1 at 144 (Dispatch Audio at 00:17-21); ECF 62-1 at 189 (Matrix at 23:10:55).  Dispatch was trying to call back to get further information.  Dispatch Audio at 00:22-29; Matrix at 23:11:08.  The caller reported that her brother, who was in his 30s, was being aggressive and hurting their mom.  Dispatch Audio at 00:57-1:01; Matrix at 23:11:37-23:11:47.  He had armed himself with a hammer, and the mom had taken it from him.  Dispatch Audio at 1:29-1:32; Matrix at 23:12:09-23:12:13.  The caller could hear the brother inside hurting their mom.  Dispatch Audio at 1:50-52; Matrix at 23:12:29.  He was known to use drugs.  Dispatch Audio at 1:54; Matrix at 23:12:29.  The mother was being strangled by the suspect.  Dispatch

---

[1] By the time of the second call, Isabella had barricaded herself in Angelo's room.  Maria Dep. 108:19-109:6; Isabella Dep. 98:17-99:3; 911 Call at 1:44-1:46.

[2] It is undisputed that this is the information dispatch communicated to officers, though Plaintiffs dispute the accuracy of the information conveyed.

United States District Court
Northern District of California

Audio at 2:33; Matrix at 23:13:15.

Officers Becerra and Perkinson arrived on the scene at approximately 11:13 p.m.  911 Call at 3:20; Dispatch Audio at 4:08; Matrix at 23:13:25-23:13:37; *see also* Maria Dep. 111:8-20 (testifying that police were "very quick," arriving within two or three minutes).  By the time police arrived, Maria had put Angelo in a bear hug.  Maria Dep. 109:20-110:11.  They were on the floor of her bedroom.  *Id.*  Angelo was on top of Maria with his head on her shoulder, her back was on the ground, and Angelo's back was towards the ceiling.  *Id.*  The officers asked Isabella who the call was for because it looked like Maria was in control.  ECF 66-3 (Isabella Dep. 111:24-113:1).  The officers "lightheartedly" made a comment about Maria being strong.  *Id.* 112:8-9.

Officers put Angelo on the floor of Maria's bedroom on his stomach, handcuffed him, crossed his legs, and "pulled [them] up to his back."[3]  Maria Dep. 113:14-114:8.  Perkinson had Angelo in a figure four leg lock, and Becerra had control of Angelo's upper body.  ECF 66-2 (Maria Dep. 121:11-22); ECF 62-2 at 61-120 (Becerra Dep. 53:21-23); ECF 62-2 at 122-163 (Shipilov Dep. 86:14-21).  Ninety seconds later, Officer Becerra informed dispatch that Angelo was detained; Angelo can be heard in the background making a groaning-like sound.  Matrix at 23:14:48-23:15:03.  Approximately two minutes later, Officer Perkinson requested an "ambulance and asked for them to be a Code 2."  ECF 62-2 at 2-59 (Perkinson Dep. 156:4-15); Matrix at 23:16:51.  A Code 2 means "as quick as you can, but not an emergency response."  *Id.* 156:16-17.  Officer Shipilov was next to arrive on scene at approximately 11:17, with Officer Hopwood following a few seconds later.  Matrix at 23:17:26, 23:17:39; ECF 66-8 (Hopwood Dep. 29:19-21); ECF 66-7 (Shipilov Dep. 93:24-2).  Perkinson and Shipilov left the room and exited the house at 11:20 to prepare for Angelo's transfer to the hospital for a Section 5150 hold.[4]  Matrix at

---

[3] Perkinson testified that as he first walked in, Angelo "made some comment about 'Don't kill me.'  And then he might have even asked his mom or somebody 'Don't let them kill me,' something to that effect."  ECF 66-6 (Perkinson Dep. 115:18-25).

[4] Section 5150 of the California Welfare and Institutions Code "allows certain medical professionals and law enforcement officers to place a person in an approved mental health facility for up to 72 hours for evaluation and treatment if there is probable cause to believe the person 'is a danger to others, or to himself or herself, or gravely disabled' 'as a result of a mental health disorder.' "  *Spath v. Cnty. of Santa Clara*, 669 F. Supp. 3d 835, 841 (N.D. Cal. Apr. 17, 2023)

United States District Court
Northern District of California

1    23:20:04; Shipilov Dep. 99:17-100:9; Perkinson Dep. 128:8-17. As Perkinson left Maria's room,

2    Angelo was still "making noises and sounds." Perkinson Dep. 152:14-21.

3        As Angelo lay prone on the floor of his mother's bedroom, an officer asked Maria some

4    questions. ECF 62-2 at 214 (Cell Video at 0:00:01-1:40). Light chuckles by the officers can be

5    heard in the background, and Maria sounded calm though she was struggling to catch her breath.

6    *Id.* At around 11:22, Maria asked if Angelo fell asleep. Cell Video at 0:00:44; Matrix at

7    23:22:19. Officer Hopwood said "he's breathing." Cell Video at 0:00:46; Matrix at 23:22:21;

8    ECF 62-1 at 191-193) (Timeline of Matrix 6 at 2). As Maria continued to try to catch her breath,

9    Officer Hopwood asked her, "Are you sure you don't need an ambulance. . . . Do you have an

10   inhaler?" Cell Video at 1:05-1:09. She said "adrenaline . . . I smoke . . . and that was hard." Cell

11   Video 1:12-1:20. Officer Hopwood asked Maria if she knew if Angelo took any medication. *Id.*

12   at 1:36. She said "not that I know of." *Id.* at 1:42. Officer Hopwood then asked Angelo. *Id.* at

13   1:44. Angelo did not respond. *Id.* at 1:45-1:59.[5]

14       Maria wanted to know what was going to happen next. *Id.* at 2:00. Officer Hopwood

15   responded that Angelo would be transported to a county hospital to be evaluated because he was

16   apparently a danger to himself or others if he was attacking Maria. *Id.* at 2:00-2:09. Maria

17   proceeded to explain that "in fairness" Angelo was "attacking because he was getting paranoid,"[6]

18   he was hallucinating; Angelo didn't want her to leave. *Id.* at 2:13-2:23. An officer asked Maria if

19

20   (citing Cal. Welf. & Inst. Code § 5150; *Bias v. Moynihan*, 508 F.3d 1212, 1220 (9th Cir. 2007)).

21   [5] Maria testified that at one point, Angelo "jerked," and at the time of her deposition, she thought

22   "that was his last breath." Maria Dep. 128:19-21. She told the officers "he just moved, and they
     didn't say anything. They didn't do anything." *Id.* at 128:21-23. Isabella testified that her "view

23   of the entire thing was very brief in itself" and for "just a microsecond of that" she was "able to
     actually see [Angelo] facedown." Isabella Dep. 116:3-12. Isabella also testified that Angelo made

24   "sounds of distress" and then "it was just silent for the rest of the time until the paramedics came."
     *Id.* at 129:22-130:2.

25

26   [6] Angelo had previously suffered a violent head injury and was hospitalized; he experienced
     paranoid episodes after sustaining that injury. Maria Dep. 71:1-83:23. One such event occurred

27   in October 2020. Officer Perkinson took Angelo to the hospital to be treated for minor scrapes
     and cuts. *Id.* 74:4-75:22. On the night of December 23, 2020, Officer Perkinson had not

28   recognized Angelo "until after everything had settled down." *Id.* 96:13-20.

1   she understood that someone who is hallucinating can be a danger, and she said "yes."  *Id.* at 2:36-

2   2:39.  The other officer added, "That's why he's going to the hospital, not to jail."  *Id.* at 2:56,

3   3:32.

4          Ambulance personnel arrived at approximately 11:25.  Matrix at 23:25:06.  Officer Becerra

5   told them that Angelo "calmed down a lot so he should be good."  Matrix at 23:25:50; Cell Video

6   at 4:16; Timeline at 2.  He asked Angelo whether he was "going to be calm still?"  Matrix at

7   23:25:50; Cell Video at 4:20; Timeline at 2.  Angelo did not respond.  Cell Video at 4:21.  Maria

8   again asked if Angelo fell asleep.[7]  Cell Video at 4:37.  The officers turned Angelo onto his side,

9   and Maria noticed blood.  Cell Video at 4:41; Becerra Dep. 107:4-112:5; Shipilov Dep. 103:16-

10  104:1.  An officer continued trying to elicit a response from Angelo.  *Id.*  An officer said, "he's not

11  answering anymore."  Matrix at 23:25:50; Cell Video 4:24.  Seconds later, Officer Hopwood said

12  "Oh, we better get him outta here."  Matrix at 23:26:25; Cell Video 4:54; ECF 62-2 at 165-213

13  (Hopwood Dep. 49:13-25, 53:12-54:24).  Officer Shipilov re-entered the house.  Matrix at

14  23:26:37.  Officer Becerra conducted a sternum rub but Angelo remained unresponsive.  Hopwood

15  Dep. 53:12-54:24.  Angelo was then rolled onto his stomach, and Officer Becerra removed the

16  handcuffs.  Matrix at 23:26:51-23:26:55; Becerra Dep. 110:22-111:1-2.  Officers then moved

17  Angelo onto a medical tarp and put him on a gurney.  Matrix at 23:27-23:27-49; Cell Video 6:20.

18         Ambulance personnel started CPR in the hallway, rolled the gurney into the driveway, and

19  continued CPR.  Matrix at 23:28:59.  Angelo was transported to the hospital.  Dispatch Audio at

20  18:12-18:41.  Ambulance personnel were not able to regain a heartbeat while transporting Angelo,

21  but doctors did regain a heartbeat at the hospital.  ECF 62-2 at 252-285 (Clayton Dep. 42:12-22);

22  ECF 62-2 at 287-309 (Diktaskis Dep. 107:20-24).  On December 26, 2020, Angelo was

23  pronounced dead.  ECF 62-2 at 431-457 (Coroner and Toxicology Reports at APD 000213, APD

24  000219).

25

26

27  [7] Defendants contend that when Maria asked if Angelo was sleeping, Angelo was still breathing,
    and Officer Becerra, who had his leg or thigh against Angelo's leg, could feel tension in Angelo's
28  legs.  ECF 66-5 (Becerra Dep. 87:23-88:10).

United States District Court
Northern District of California

United States District Court
Northern District of California

2.   Disputed Facts

The parties dispute the facts surrounding the restraint.[8]

As to the amount of force applied during the restraint, Maria testified that Officer Becerra was kneeling on the back of Angelo's neck or shoulder.  Maria Dep. 114:8-21; 125:8-126:14.  The "[o]fficer was huge.  Angelo was tiny." *Id.* 114:23-24.  She testified that Angelo "wasn't doing anything," "wasn't resisting," and "wasn't fighting." *Id.* 116:3-18.  Officer Becerra testified that Angelo did not attack the officers but was trying to pull away and that he only ever had his left knee on Angelo's shoulder for what "may have been a minute[.]"  Becerra Dep. 50:2-8, 53:15-16, 54:3-16; 58:8-10, 66:3-6, 67:11-16.  Officer Shipilov testified that "Officers were holding down [Angelo]."  Shipilov 86:13-87:1.  "Officer Becerra was holding Angelo's chest down," "controlling his upper body. . . . either in a catcher's squat or kneeling on the floor" while Angelo was on his stomach and in handcuffs.  *Id.* 86:14-25, 89:15-89:24, 91:14-92:12.  Officer Hopwood testified that he thought Officer Becerra's knee was on Angelo, in a position for Officer Becerra to have his weight on Angelo.  Hopwood Dep. 32:10-34:9, 37:2-38:1.  Officer Shipilov testified that Officer Perkinson had Angelo's legs in a figure four leg lock.  Shipilov Dep. 86:14-21.  As Officer Perkinson exited the house to complete paperwork for the 5150 hold, Officer Becerra took over for him, maintaining Angelo's legs in a hold.  *Id.* 92:18-94:22.  Officer Hopwood took over for Officer Becerra and put his left knee on the back of Angelo's shoulder for about 20-30 seconds.  Hopwood Dep. 38:5-39:14.  Officer Hopwood then moved to the catcher position and eventually put his knees down for about a minute or two while talking to Maria, until he stood up.  *Id.* 43:1-44:3.

As to the length of time Angelo was left on his stomach, handcuffed, and in the prone restraint, Officer Perkinson testified that from the point of entering the house, it took about thirty seconds to get Angelo into handcuffs, two minutes to detain Angelo, and less than two minutes

---

[8] During oral argument, Defendants conceded that significant disputes of fact exist regarding how Angelo was restrained.  In their papers, Plaintiffs agree in part.  ECF 66 at 18.  While Plaintiffs contend that the officers' "use of force was clearly severe and substantial; . . . genuine factual disputes underlying this consideration prevent this Court from deciding this issue." *Id.*

United States District Court
Northern District of California

1    from when Angelo was detained to the call requesting an ambulance to transport Angelo for the

2    5150 hold.  Perkinson Dep. 127:22-128:17, 146:22-147:1.  Officer Perkinson estimated that

3    Angelo was in the prone restraint for approximately three and a half minutes, and Angelo was still

4    in the prone position when he left the room.  *Id.* 147:14-21, 152:13-15.  Officer Hopwood testified

5    that from the time he first put his knee on Angelo to the time he stood up, about four to five

6    minutes had passed, more than the three minutes he had originally estimated.  Hopwood Dep.

7    43:1-11.  Officer Becerra testified that Angelo was in the restraint (i.e., in the prone position

8    handcuffed with legs in a figure four) until paramedics arrived.  Becerra Dep. 102:12-24.

9    Plaintiffs contend that the officers unreasonably kept Angelo in the restraint until the paramedics

10   arrived, for a total of 10 to 11 minutes.  ECF 66 at 11.

11          **B.      Procedural Background**

12          Maria and Isabella commenced this action on August 8, 2021.  ECF 1.  They bring six

13   causes of action: (1) a claim under 42 U.S.C. § 1983 for unreasonable seizure and excessive force

14   in violation of the Fourth Amendment and for violation of substantive due process under the

15   Fourteenth Amendment based on failure to provide medical care (brought by Maria against Chief

16   Brooks[9] and the individual officers), (2) a claim under Section 1983 for violation of familial

17   association rights under the Fourteenth Amendment (brought by Maria against the individual

18   officers), (3) a claim under Section 1983 and *Monell v. Department of Social Services*, 436 U.S.

19   658, 691 (1978) (brought by Maria against the City and Chief Brooks), (4) a claim for violation of

20   the Bane Act, California Civil Code § 52.1 (brought by Maria against all defendants), (5) a claim

21   for wrongful death/negligence under California Code of Civil Procedure §§ 377.60 and 377.61

22   (brought by Maria against all defendants),[10] and (6) a claim for negligent infliction of emotional

23   distress against the individual officers (brought by Maria and Isabella against the individual

---

[9] On stipulation of the parties, the Court dismissed the first cause of action against Chief Brooks with prejudice.  ECF 81.

[10] Plaintiffs misnumbered the causes of action in their complaint.  *See* ECF 1 ¶¶ 48-51, 52-57 (referring to both the Bane Act claim and wrongful death claim as the fourth cause of action). Rather than refer to two different causes of action as they are incorrectly captioned, the Court will refer to the wrongful death claim as the fifth cause of action.

officers).  *Id.* ¶¶ 37-38, ¶¶ 39-40, ¶¶ 41-47, ¶¶ 48-51, ¶¶ 52-57, ¶¶ 58-60.

On October 29, 2021, Defendants moved to dismiss the *Monell* claim or alternatively, to bifurcate the individual liability claims from the *Monell* claim.  ECF 13.  The Court denied the motion to dismiss but granted the request for bifurcation.  ECF 21.  Defendants filed their answer to the complaint on January 18, 2022.  ECF 24.

On August 3, 2023, Defendants moved for summary judgment.  ECF 62.  On August 21, 2023, Plaintiffs filed a combined opposition and cross-motion for partial summary judgment on the issues of excessive force and causation.  ECF 66.  Defendants' combined reply in support of their motion and opposition to Plaintiffs' cross motion followed on September 7, 2023.  ECF 69. Plaintiffs filed a reply in support of their cross motion on September 14, 2023.  ECF 71.

On September 7, 2023, Plaintiffs filed three *Daubert* motions to exclude evidence.  ECF 70; ECF 70-1; ECF 70-2.  Defendants filed a combined opposition to the motions on October 12, 2023.  ECF 74.  Plaintiffs filed their reply on October 26, 2023.  ECF 75.  The Court held a hearing on the motions on December 14, 2023.  ECF 78.  On order of the Court, the parties submitted supplemental post-hearing briefs.  ECF 84, 90.

## II.    LEGAL STANDARD

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of establishing the absence of a genuine issue of material fact for trial lies with the moving party. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The court must view the evidence in the light most favorable to the non-moving party, and "draw[s] all justifiable inferences" in its favor.  *Fresno Motors, LCC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).  A genuine factual issue exists if sufficient evidence favors the non-movant such that "a reasonable [judge or] jury could return a verdict for the nonmoving party."  *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (quoting *Anderson*, 477 U.S. at 248) (alteration in original).  The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.  *City of Pomona v. SQM N.*

United States District Court
Northern District of California

8

1    *Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting *Anderson*, 477 U.S. at 255).

2          To defeat summary judgment once the moving party has met its burden, the nonmoving

3    party may not simply rely on the pleadings, but must point to specific facts, by affidavit or as

4    otherwise provided by Federal Rule of Civil Procedure 56, showing that a genuine issue of

5    material fact exists. *Devereaux*, 263 F.3d at 1076.  More than a "scintilla of evidence" must exist

6    to support the non-moving party's claims. *City of Pomona*, 750 F.3d at 1049 (quoting *Anderson*,

7    477 U.S. at 252).  A showing that "there is some 'metaphysical doubt' as to the material facts as

8    issue" will not suffice. *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting

9    *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "Where the

10   record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there

11   is no genuine issue for trial." *City of Pomona*, 750 F.3d at 1049-50 (quoting *Matsushita*, 475 U.S.

12   at 587).

## III.    DISCUSSION

13

14         The Court first addresses Defendants' motion for summary judgment, then turns to the

15   portion of Plaintiffs' cross-motion for partial summary judgment concerning their excessive force

16   claim.[11]

### A.    Defendants' Motion for Summary Judgment

17

18         Defendants move for summary judgment on Plaintiffs' first, second, fourth, fifth, and sixth

19   causes of action.  ECF 62 at 18-32.  The Court analyzes the federal claims first, then the state law

20   claims.

21              1.    Federal Claims

22                   *a.    Unlawful Seizure, Excessive Force, and Deprivation of Medical*

23                          *Care (Claim 1)*

24         Plaintiffs' first cause of action for relief under Section 1983 is three-fold.  ECF 1 ¶ 38.

25   They allege a violation of the Fourth Amendment based on the officers' unreasonable seizure of

26

27   ───────────────────

[11] The Court will resolve the portion of Plaintiffs' cross-motion for partial summary judgment
concerning causation and the related Daubert motions to exclude evidence by separate order.

28

1    Angelo, a violation of the Fourth Amendment based on the officers' use of excessive force, and a

2    violation of substantive due process under the Fourteenth Amendment based on failure to provide

3    medical care.  *Id.*  The Court addresses each ground in turn.

4                                    i.    *Unlawful Seizure*

5            "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the

6    Government."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S.

7    1, 9 (1968)).  It "permits brief investigative stops . . . when a law enforcement officer has 'a

8    particularized and objective basis for suspecting the particular person stopped of criminal

9    activity.' "  *Navarette v. California*, 572 U.S. 393, 396-97 (2014) (quoting *United States v. Cortez*,

10   449 U.S. 411, 417-418 (1981)).  This standard "takes into account 'the totality of the

11   circumstances—the whole picture.' "  *Id.* (citing *Cortez*, 449 U.S. at 417).

12           Defendants argue that summary judgment is appropriate on Plaintiffs' first cause of action

13   on the basis that Officers Perkinson and Becerra had a lawful right to detain Angelo or are at least

14   entitled to qualified immunity for doing so.  ECF 62 at 24.  Plaintiffs argue that Defendants had no

15   probable cause to handcuff Angelo, arrest him,[12] or even place him on a Section 5150 hold

16   without further investigation.  ECF 66 at 15-16.

17           Based on the undisputed facts before the Court, when viewed in the light most favorable to

18   Plaintiffs, no reasonable jury could conclude that Officers Perkinson and Becerra lacked

19   reasonable suspicion to detain Angelo.  Isabella called 911 reporting that her brother was attacking

20   their mom and strangling her, and that she had grabbed a hammer because her brother, who used

21   drugs, was reaching for it.  While Plaintiffs dispute how those events actually unfolded, there is no

22   dispute about what information Isabella conveyed to 911, and in turn, what information dispatch

23   conveyed to responding officers.  When Officers Becerra and Perkinson arrived on scene, they

24   found Maria on the floor of her bedroom holding her 30-year-old son Angelo in a bear hug.  The

25   appearance that Maria might have been in control of her son or that the officers' audible chuckling

26   ───────────────

27   [12] The basis for Plaintiffs' challenge to an arrest separate from the detention or Section 5150 hold
     is unclear.  When asked about this at oral argument, Plaintiffs clarified that they challenge the
28   detention and 5150 hold only.

United States District Court
Northern District of California

1    suggested an urgency less than that which Isabella conveyed when calling 911 does not mean that

2    officers lacked reasonable suspicion to detain Angelo for purposes of investigating what both sides

3    concede was a mental health crisis.  Indeed, "[t]he whole point of an investigatory stop, as the

4    name suggests, is to allow police to *investigate*."  *See Gallegos v. City of Los Angeles*, 308 F.3d

5    987, 991 (9th Cir. 2002) (emphasis in original).

6        Defendants' motion for summary judgment on Plaintiffs' first claim for relief is therefore

7    granted to the extent the basis for it is the alleged unlawful detention.

8        Defendants are likewise entitled to summary judgment on Plaintiffs' first cause of action to

9    the extent the basis for the claim is an unlawful Section 5150 hold.  Involuntary commitment of

10   the mentally ill "is analogous to a criminal arrest and must therefore be supported by probable

11   cause."  *Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1992) (citations omitted).  In the context of

12   Section 5150, California courts have established the following standard:

> To constitute probable cause to detain a person pursuant to [S]ection
> 5150, a state of facts must be known to the peace officer (or other
> authorized person) that would lead a person of ordinary care and
> prudence to believe, or to entertain a strong suspicion, that the
> person detained is mentally disordered and is a danger to himself or
> herself or is gravely disabled.  In justifying the particular intrusion,
> the officer must be able to point to specific and articulable facts
> which, taken together with rational inferences from those facts,
> reasonably warrant his or her belief or suspicion.  Each case must be
> decided on the facts and circumstances presented to the [detaining
> person] at the time of the detention, and the [detaining person] is
> justified in taking into account the past conduct, character, and
> reputation of the detainee.

21   *Heater v. Southwood Psychiatric Ctr.*, 42 Cal. App. 4th 1068, 1080 (1996) (quoting *People v.*

22   *Triplett*, 144 Cal. App. 3d 283, 286-87 (1983)).

23       Urging the Court to determine whether probable cause supported a 5150 hold based only

24   on the officers' personal observations, Plaintiffs describe the relevant circumstances as follows:

> Maria informed the Officers that Angelo did not harm the family
> and that he likely had an undiagnosed mental illness[.]  The Officers
> observed Maria and Angelo in a bear hug chest-to-chest and leaning
> on a TV stand.  Angelo was not in control of his mother and the
> Officers quipped at how strong Maria was and how she appeared to
> be in control of him.

28

1    ECF 71 at 6.

2         As a preliminary matter, *Heater* contravenes the assertion that the determination of

3    probable cause for a 5150 hold must rest solely on the detaining officer's personal observations.

4    *See* 42 Cal. App. 4th at 1080; *see also Palter v. City of Garden Grove*, 237 F. App'x 170, 172 (9th

5    Cir. 2007) (applying *Heater* and affirming summary judgment in favor of officer where the officer

6    placed a suspect on a 5150 hold based, in part, on information relayed by 911).  Moreover, the

7    case Plaintiffs cite for their proffered standard—*Fish v. Regents of Univ. of Cal.*—discussed the

8    personal observations requirement in the context of a statute applying to a physician overseeing a

9    county hospital, which is not at issue here.  *See* 246 Cal. App. 2d 327 (1966).

10        In this case, the undisputed evidence entitles Defendants to summary judgment on the

11   claim for unreasonable seizure based on the 5150 hold.  As discussed above, Isabella told dispatch

12   that she grabbed a hammer because Angelo was reaching for it, that Angelo used drugs, and that

13   Angelo was restraining and strangling their mom.  Dispatch relayed this information to the

14   responding officers.  When Officers Becerra and Perkinson arrived, Maria was on the floor of her

15   bedroom holding her 30-year-old son in a bear hug.  When speaking with the officers, Maria told

16   them that her son was paranoid and hallucinating, and she acknowledged that someone

17   hallucinating could be danger to themself or others.  There is no dispute that he was suffering a

18   mental health crisis.

19        Viewing all this evidence in the light most favorable to Plaintiffs, no reasonable jury could

20   conclude that officers lacked probable cause to place Angelo on a 5150 hold.  *See Est. of Nunis by*

21   *& through Nunis v. City of Chula Vista*, --- F. Supp. 3d. ---, ---, No. 21-CV-01627-AJB-DEB,

22   2023 WL 3940563, at *12 (S.D. Cal. June 9, 2023) (granting summary judgment on false

23   imprisonment claim where record "compel[led] the sole conclusion that the officers had probable

24   cause to detain [the decedent] for a mental health evaluation pursuant to Section 5150" in response

25   to threat to jump out a second story window).

26        Accordingly, the Court grants Defendants' motion for summary judgment on the first

27   cause of action to the extent the basis for the claim is the 5150 hold.

28

United States District Court
Northern District of California

12

ii.    *Excessive Force*

A claim of excessive force in the context of an arrest or investigatory stop implicates the Fourth Amendment right to be free from "unreasonable . . . seizures." U.S. Const. amend. IV; *see Graham v. Connor*, 490 U.S. 386, 394 (1989). Courts analyze claims of excessive force under an "objective reasonableness" standard. *Id.* at 388. "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (citations and internal quotation marks omitted).

*Graham's* "proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The "most important single element" is whether there is an immediate threat to safety. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). These factors "are not exclusive. Rather, [courts] examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.' " *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citing *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). Courts also consider the " 'quantum of force' used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and the plaintiff's mental and emotional state." *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (internal citations omitted).

"[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (citations omitted). "Because the

13

excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citation omitted).

Defendants argue that Officers Perkinson, Becerra, and Hopwood used "limited," "lawful" force to get Angelo into handcuffs and that they applied "limited," "appropriate" force once Angelo was in handcuffs.[13]  ECF 62 at 26.  They further argue that Officer Shipilov never touched Angelo at any time.  *Id.*

In opposition, Plaintiffs argue that "[m]aterial fact questions preclude summary judgment on whether Defendant Officers used unreasonable force on Angelo by placing him in handcuffs, putting his legs in a figure four lock, and applying significant downward pressure on his back as he laid prone." ECF 66 at 17.  They also contend that the officers used excessive force when they kept Angelo in the prone position for an extended period of time by failing to place him in the recovery position before he stopped breathing.  *See id* at 18-19.

The Court "first assess[es] the quantum of force used to arrest [Angelo] by considering 'the type and amount of force inflicted.' " *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001)).  "Prevailing precedent in the Ninth Circuit is that law enforcement officers' use of body weight to restrain a 'prone and handcuffed individual[ ] in an agitated state' can cause suffocation 'under the weight of restraining officers,' therefore, such conduct may be considered deadly force." *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1155 (E.D. Cal. 2016) (citing *Drummond*, 343 F.3d at 1056-57).  "[K]nown as 'compression asphyxia,' prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers." *Id.*  (quoting *Drummond*, 343 F.3d at 1056-57 (collecting cases)).

---

[13] At oral argument, however, Defendants conceded that significant disputes of fact exist regarding how Angelo was restrained.

14

1          Here, the degree to which any movement by Angelo interfered with the officers' ability to

2   restrain him is in dispute.  The parties similarly dispute whether the application of force when

3   handcuffing Angelo, putting his legs in a figure four leg lock, and applying pressure while he laid

4   prone was reasonable.  Also disputed is whether it was reasonable for officers to keep Angelo in a

5   prone position for several minutes while he was handcuffed, non-violent and non-responsive for

6   an extended period of time.  A reasonable jury could resolve these genuine disputes of material

7   fact in favor of Plaintiffs and find that the officers' conduct constituted lethal force.

8          To determine the countervailing governmental interests, the Court must examine the non-

9   exhaustive factors set out in *Graham*, including "the severity of the crime at issue, whether the

10  suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

11  resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  In assessing

12  these factors, "a detainee's mental illness" must be taken into account.  *Drummond*, 343 F.3d at

13  1058.  The Ninth Circuit has held:

> The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end.  In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. . . .  Even when an emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.  We do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals.  Instead, we emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed.

26  *Id.* (citing *Deorle*, 272 F.3d at 1282-83).

27         Viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude

28  that the countervailing governmental interests did not justify the potentially lethal force used.

United States District Court
Northern District of California

While officers were initially dispatched to investigate a potential attack, Angelo was suffering a paranoid episode, and a jury could determine that the amount of force (including the force in handcuffing, placing Angelo in a figure four leg lock, and keeping Angelo prone after he had "calmed down") exceeded the need presented under the circumstances. A jury could also credit Maria's testimony that Angelo was not resisting, over Officer Becerra's testimony that Angelo was trying to pull away, and could thus determine that Angelo was not a threat.

These genuine disputes of material fact preclude summary judgment for Defendants on Plaintiffs' first cause of action, to the extent it is based on the alleged excessive force applied by having Angelo handcuffed in the prone restraint with his legs in a figure four lock and keeping Angelo in an extended prone restraint without putting him in the recovery position.

Nonetheless, Defendants contend that they are entitled to qualified immunity on Plaintiffs' excessive force claim. ECF 66 at 26. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Waid v. Cnty. of Lyon*, 87 F.4th 383, 387 (9th Cir. 2023) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "An officer is entitled to qualified immunity unless the plaintiff shows that (1) the officer violated the plaintiff's constitutional right and (2) the right was clearly established at the time of the incident." *Martinez v. High*, 91 F.4th 1022, 1028 (9th Cir. 2024) (internal quotations and citation omitted). The court may exercise its discretion in deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The Supreme Court has cautioned that specificity in determining whether "the violative nature of particular conduct is clearly established . . . is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* at

12 (quotations and citation omitted).  "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 548 U.S. ---, ---, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 577 U.S. at 13).  The Supreme Court "do[es] not require a case directly on point"; it requires "existing precedent" to "place[ ] the statutory or constitutional question beyond debate."  *Waid*, 87 F.4th at 387 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  To overcome qualified immunity, "[i]t is the plaintiff[s] who bear[] the burden of showing that the rights allegedly violated were clearly established."  *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (internal quotation marks and citation omitted).  They "must either explain why their case is obvious under existing general principles or, more commonly, show specific cases that control or reflect a consensus of non-binding authorities in similar situations."  *Waid*, 87 F.4th at 388.

As to the application of force during the prone restraint, viewing the facts in the light most favorable to Plaintiffs, the officers' conduct violated law clearly established in *Drummond*, "which held that 'compression asphyxia'—particularly where a detainee was mentally ill, unarmed, restrained, and begging for air—constituted excessive force that 'any reasonable officer would have known . . . amounted to a constitutional violation.' "  *See Barrera v. Krause*, No. 22-15542, 2023 WL 2064512, at *1 (9th Cir. Feb. 17, 2023); *see also Perkins v. Edgar*, No. 21-55552, 2022 WL 14476272, at *1 (9th Cir. Oct. 25, 2022) (reiterating that *Drummond* "should have put the Officers on notice that their conduct violated clearly established law when they placed their bodyweight, including [an officer's] right knee, onto [the suspect's] back and neck area while [the suspect] lay handcuffed on his stomach" and rejecting the argument that the failure to plead for air was dispositive where circumstances should have put officers on notice that [the suspect] was already unresponsive).  Here, Defendants would have been on notice that, when Angelo was in handcuffs and laid prone on the ground, additional force, as may or may not have been applied here, was unlawful.  Qualified immunity does not, therefore, entitle Officers Becerra (who applied pressure to Angelo's upper body then to his legs), Hopwood (who applied pressure to Angelo's upper body), Perkinson (who initiated the figure four leg lock), and Shipilov (who failed to

United States District Court
Northern District of California

1    intervene, as discussed below), to summary judgment to the extent Plaintiffs' claim for excessive

2    force is based on the application of force in connection with the prone restraint.

3        *Drummond* does not, however, preclude qualified immunity to the extent Plaintiffs

4    challenge the officers' application of force in handcuffing Angelo or the officers' failure to place

5    Angelo in the recovery position.  *Perez v. City of Fresno* also does not help Plaintiffs.  *See* 591 F.

6    Supp. 3d 725, 758 (E.D. Cal. 2022).  In that case, the court found sufficient evidence for a jury to

7    conclude that officers used excessive force against a suspect.  *Id.* at 758.  There, the officers

8    struggled with the suspect while in the prone position and kept him in the prone position though he

9    could have been rolled onto his side.  *Id.*  In addition, the officers did not adequately check on the

10   suspect's ability to breathe.  *Id.*  The court nonetheless granted summary judgment in favor of the

11   officers on qualified immunity grounds.  *Id.* at 761.  That outcome is warranted here.  Plaintiffs

12   cite no other authority to support that a clearly established right existed in either context (the

13   handcuffing or the recovery position).  ECF 66 at 25.  Without it, they have not met their burden

14   to deprive the officers of qualified immunity.  *See Shafer*, 868 F.3d at 1118.

15       Accordingly, Defendants' motion for summary judgment is granted in part on qualified

16   immunity grounds as to the first cause of action, to the extent the alleged excessive force is based

17   on the officers' application of force in handcuffing Angelo or their failure to place him in the

18   prone position.  The motion is denied in part as to the first cause of action, to the extent it

19   challenges the officers' application of force during the prone restraint.

20                    *iii.*    *Integral Participation*

21       Generally, a government official is only liable for their own misconduct.  *Ashcroft v. Iqbal*,

22   556 U.S. 662, 677 (2009) ("In a § 1983 suit . . . where masters do not answer for the torts of their

23   servants—the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each

24   Government official, his or her title notwithstanding, is only liable for his or her own

25   misconduct.").  However, an officer may be liable for conduct where there has been "integral

26   participation . . . in the alleged constitutional violation."  *Torres v. City of Los Angeles*, 548 F.3d

27   1197, 1206 (9th Cir. 2008) (citing *Chuman v. Wright*, 76 F.3d 292, 294-95 (9th Cir. 1996)).

28   " '[I]ntegral participation' does not require that each officer's actions themselves rise to the level

18

1 | of a constitutional violation." *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004).

2 | Nonetheless, each officer must have been fundamentally involved in the conduct that allegedly

3 | caused the violation. *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007).

4 |      "A person deprives another of a constitutional right within the meaning of section 1983, if

5 | [they commit] an affirmative act, participate[] in another's affirmative acts, or omit to perform an

6 | act which [they are] legally required to do that causes the deprivation of which the plaintiff

7 | complains." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (quoting *Johnson v. Duffy*, 588

8 | F.2d 740, 743 (9th Cir. 1978)) (internal quotations and alterations omitted). "The inquiry into

9 | causation must be individualized and focus on the duties and responsibilities of each individual

10 | defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Id.*

11 | (citations omitted).

12 |      Defendants seek summary judgment in favor of Officer Shipilov because he did not touch

13 | Angelo, was in the home for only 2.5 minutes, and was not involved in the restraint. ECF 62 at

14 | 27. They argue that Officer Shipilov "ha[d] no duty to intervene if he was not aware of any

15 | problems, nor if he [wa]s not present to be able [to] intervene" and that he is entitled to qualified

16 | immunity in any event. *Id.* Plaintiffs contend that Officer Shipilov had an opportunity to

17 | intercede but did not do so. ECF 66 at 24.

18 |      Officer Shipilov testified that when he arrived, he saw officers holding Angelo down,

19 | Officer Perkinson had Angelo in a figure four leg lock, and Officer Becerra was controlling

20 | Angelo's upper body, "just kind of holding his chest down." Angelo's mother, however, testified

21 | that Officer Becerra was huge and had his leg on Angelo's neck or shoulder, even though Angelo

22 | was not resisting. By the time Officer Shipilov arrived, he observed Officer Becerra holding

23 | Angelo's chest down while Angelo was on his stomach and handcuffed. In training, Officer

24 | Shipilov covered alternatives to putting body weight on a suspect's back while the suspect is in

25 | prone position and use of the recovery position.[14] *See* Shipilov Dep. 30:13-31:1, 36:12-37:13,

[14] The City contends that the recovery position "is only mandated per the policy of Antioch if someone is rendered unconscious, to make sure that if they vomit, they do not choke on that." ECF 69 at 7.

19

39:24.

Viewing these facts in the light most favorable to the Plaintiffs, a reasonable jury could conclude that the 2.5 minutes Officer Shipilov was in the house gave him ample opportunity to intervene.  A reasonable jury could also conclude that Angelo was not resisting, in which case Officer Shipilov should have acted promptly consistent with his training to ensure that his colleagues ceased putting their weight on Angelo, who was making noises and sounds which a reasonable jury could also determine were noises and sounds of distress.  *Cf. Blankenhorn*, 485 F.3d at 487 n.12 (officer who arrived on scene after suspect was arrested, and "who at most provided crowd control, did not participate in any integral way in the arrest.").

Accordingly, Defendants' motion for summary judgment as to Officer Shipilov is denied. As discussed above, Officer Shipilov is also not entitled to qualified immunity because *Drummond* would have put him on notice that applying force while Angelo was handcuffed and laid prone was potentially lethal force.

### iv.    *Deprivation of Medical Care*[15]

Defendants additionally argue that they are entitled to summary judgment on Plaintiffs' first cause of action because it is undisputed that Officer Perkinson called for an ambulance within two minutes of Angelo's detention.  ECF 62 at 28.  "[A] police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment." *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006).  In opposition, Plaintiffs argue that the officers' application of force in handcuffing and restraining Angelo, and their failure to place Angelo in a recovery position, elevated Angelo's need for medical care such that dispatching a non-emergency medical transfer does not satisfy the Fourth Amendment.  ECF 66 at 28.

Even if a jury reasonable could agree with Plaintiffs that the officers failed to promptly

---

[15] Defendants' motion characterizes this claim as arising under the Fourth Amendment, as does Plaintiffs' opposition brief.  ECF 62 at 27; ECF 66 at 28.  Plaintiffs' complaint, however, asserts the failure to provide medical care as the basis for the alleged violation of the Fourteenth Amendment's due process clause.  ECF 1 ¶ 38.  The Court resolves this under the Fourth Amendment because that is what the parties address in their papers.

United States District Court
Northern District of California

1    dispatch medical personnel, the officers rightly contend that they are entitled to qualified

2    immunity.  Plaintiffs point to no case clearly establishing the right to the elevated medical need

3    theory they advance.  Without it, they have failed to shoulder their burden in overcoming the

4    officers' entitlement to qualified immunity.  *See Shafer*, 868 F.3d at 1118.

5          Therefore, on the basis of qualified immunity, the Court grants Defendants' motion for

6    summary judgment as to the first cause of action insofar as it stems from the alleged deprivation of

7    medical care.

8                    ***b.        Familial Association (Claim 2)***

9          The Fourteenth Amendment states in relevant part that "[n]o State shall . . . deprive any

10   person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

11   "[A] parent has a constitutionally protected liberty interest under the Fourteenth Amendment in

12   the companionship and society of his or her child and . . . a child's interest in her relationship with

13   a parent is sufficiently weighty by itself to constitute a cognizable liberty interest."  *Ochoa v. City*

14   *of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022).  In order to show a violation of the right to familial

15   association under the Fourteenth Amendment's due process clause, a plaintiff must establish that

16   the officers' conduct "shocks the conscience."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846

17   (1998).

18         "There are two tests used to decide whether officers' conduct 'shocks the conscience.' "

19   *Ochoa*, 26 F.4th at 1056.  Determining "[w]hich test applies turns on whether the officers had time

20   to deliberate their conduct."  *Id.*  The "deliberate indifference" standard applies "if the situation at

21   issue 'evolve[d] in a time frame that permits the officer to deliberate before acting.' "  *Id.*

22   (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)).  "As the very term 'deliberate

23   indifference' implies, the standard is sensibly employed only when actual deliberation is

24   practical[.]"  *Lewis*, 523 U.S. at 851-53.  "Deliberation in this context 'should not be interpreted in

25   the narrow, technical sense.' "  *Ochoa*, 26 F.4th at 1056 (quoting *Wilkinson v. Torres*, 610 F.3d

26   546, 554 (9th Cir. 2010) (explaining that "the Supreme Court had rejected the deliberate

27   indifference standard even in cases where an officer giving chase could have deliberated while

28   pursuing the suspect." (citing *Porter*, 546 F.3d at 1139-40))).

A different test applies to situations "that escalate so quickly that the officer must make a snap judgment." *Porter*, 546 F.3d at 1137. In those cases, the "purpose to harm" standard applies. This standard requires a plaintiff to make "a more demanding showing that [an officer] acted with a *purpose to harm* [the decedent] for reasons unrelated to legitimate law enforcement objectives." *Id.* (emphasis in original) (citing *Lewis*, 523 U.S. at 836). "For example, a purpose to harm might be found where an officer uses force to bully a suspect or 'get even,' " *Wilkinson*, 610 F.3d at 554 (citation omitted), "or when an officer uses force against a clearly harmless or subdued suspect." *Ochoa*, 26 F.4th at 1056 (quotation marks and citations omitted). The Ninth Circuit has explained that "when an officer encounters fast paced circumstances presenting competing public safety obligations, the purpose to harm standard must apply." *Id.* at 1139.

"A court may determine at summary judgment whether the officer had time to deliberate (such that the deliberate indifference standard applies) or instead had to make a snap judgment because he found himself in a quickly escalating situation (such that the purpose to harm standard applies), so long as the undisputed facts point to one standard or the other." *C.E.W. v. City of Hayward*, No. 13-CV-04516-LB, 2015 WL 1926289, at *13 (N.D. Cal. Apr. 27, 2015) (quotation marks and citation omitted). "By its nature, though, the determination of which situation [the officer] actually found himself in is a question of fact for the jury, so long as there is sufficient evidence to support both standards." *Id.* (alteration in original; quotation marks and citation omitted).

Urging the Court to adopt the purpose to harm standard,[16] Defendants argue that this claim fails because "[a]ll the evidence shows the officers just tried to restrain Quinto with limited force and were awaiting the ambulance for the 5150 hold transport." ECF 62 at 29. As discussed above, genuine factual disputes exist as to whether the force was "limited" or "lawful" in the way

---

[16] Defendants claim that Plaintiffs have conceded this standard applies given the allegations in the complaint, which rely on the purpose to harm standard. *See* ECF 62 at 28; ECF 1 ¶ 40 ("Defendants acted maliciously with an intent to harm Decedent unrelated to legitimate law enforcement purposes in killing Decedent."). The Court does not view this as dispositive. *See C.E.W.*, 2015 WL 1926289, at *13 (concluding that the Court can apply either standard so long as supported by the undisputed facts).

1    Defendants claim.

2         Indeed, viewing the facts in the light most favorable to Plaintiffs—where the officers let

3    Angelo remain face down on the floor, handcuffed, prone, and restrained "for anywhere from 4 to

4    10 minutes"—a reasonable jury could find that the officers had time to deliberate.[17]  *See Porter*,

5    546 F.3d at 1139 ("where officers have ample time to correct their obviously mistaken detention

6    of the wrong individual, but nonetheless fail to do so, the suspect's family members need only

7    plead deliberate indifference to state a claim under the due process right to familial association.").

8    Additionally, a reasonable jury could find that the officers acted with deliberate indifference when,

9    after Angelo made "sounds of distress," officers left Angelo on the floor, prone, and restrained as

10   he lay unresponsive to their questions and "silent for the rest of the time until the paramedics

11   came."  *See Garlick*, 167 F. Supp. 3d at 1171  (denying summary judgment where once the

12   suspect "was in handcuffs[,]" and "the circumstances had de-escalated[,]" officers "could

13   deliberate whether to continue applying weight to his back"); *cf. Ochoa*, 26 F.4th at 1057

14   (summary judgment appropriate where officers did not have time to deliberate before shooting

15   victim, who had engaged in a domestic dispute allegedly involving a gun while possibly under the

16   influence of heroin or meth, failed to pull over when police tried, and had been driving erratically,

17   including on the wrong side of the road directly at police officers).

18        Plaintiffs, however, ignore Defendants' argument that the officers are entitled to qualified

19   immunity on this claim.  *Drummond* helps Plaintiffs overcome qualified immunity in the Fourth

20   Amendment context, and this Court recognizes, as has the Ninth Circuit, that "applying the Fourth

21   Amendment excessive-force standard to a Fourteenth Amendment claim for loss of

22   companionship and familial association following a fatal police shooting might have 'surface

23   appeal.' "  *Ochoa*, 26 F.4th at 1056.  Indeed, *"*[t]he gist of the two claims is the same: an officer is

24   accused of improperly using police power to kill someone."  *Id.*

25        Nonetheless, the Ninth Circuit has made clear that "Fourth Amendment cases therefore do

26

27   ───────────────
     [17] Officer Shipilov even testified that when he exited the house, he "think[s] [he] was just sitting in
     [his] car at that time, maybe doing something on the computer, checking pending calls for

28   service."  Shipilov Dep. 99:24-100:8.

United States District Court
Northern District of California

1  not clearly establish the contours of the Fourteenth Amendment substantive due process rights[.]"

2  *Nicholson v. City of Los Angeles*, 935 F.3d 685, 696 & n.5 (9th Cir. 2019); *Perkins*, 2022 WL

3  14476272, at *2 (*Drummond* was clearly established law for purposes of Fourth Amendment

4  excessive force claim but the district court erred in determining that right to familial association

5  was clearly established); *see also Gonzalez v. City of Alameda*, No. 21-CV-09733-DMR, 2023

6  WL 6232239, at *27 (N.D. Cal. Sept. 22, 2023) (declining to read *Drummond* as clearly

7  establishing rights under the Fourteenth Amendment).

8      Here, then, because Plaintiffs failed to carry their burden that it was clearly established that

9  the officers' conduct violated Plaintiffs' Fourteenth Amendment rights, Defendants' motion for

10  summary judgment on Plaintiffs' second cause of action is granted on the basis of qualified

11  immunity.

12          2.   <u>State Law Claims</u>

13          a.   ***Bane Act (Claim 4)***

14      California's Bane Act allows a claim for violation of a plaintiff's state or federal civil

15  rights when the violation is achieved through "threats, intimidation, or coercion."  Cal. Civ. Code

16  § 52.1.  The Ninth Circuit has "draw[n] two conclusions as to the necessary showing for an

17  excessive force claim under the Bane Act."  *See Reese v. Cnty. of Sacramento*, 888 F.3d 1030,

18  1043 (9th Cir. 2018).  "First, the Bane Act does not require the 'threat, intimidation or coercion'

19  element of the claim to be transactionally independent from the constitutional violation

20  alleged. . . [.]"  Second, the Bane Act requires "a specific intent to violate the arrestee's right to

21  freedom from unreasonable seizure."  *Id.* at 384 (citing *Cornell v. City and Cnty. of San*

22  *Francisco,* 17 Cal. App. 5th 766, 798-802 (2017)).  Such intent may be shown through an officer's

23  "reckless disregard of constitutional [or statutory] prohibitions or guarantees."  *Cornell*, 17 Cal.

24  App. 5th at 803.

25      Defendants seek summary judgment on this claim, arguing that "there simply is no

26  evidence that the officers had the <u>intent</u> to deprive [Angelo] of any right, including the intent to

27  deliberately use any force to cause injury."  ECF 62 at 31 (emphasis in original).

28      Given the record before it, the Court cannot draw any conclusions regarding intent as a

United States District Court
Northern District of California

matter of law.  As Defendants concede, there are significant disputes about the circumstances of the restraint.  Those factual disputes preclude a finding that Plaintiffs fail to satisfy the elements of their Bane Act claim.  A reasonable jury could find that Angelo did not pose a threat to the officers and was not resisting, and from there, reach the conclusion that officers acted with reckless disregard.  Accordingly, Defendants' motion for summary judgment is denied as to Plaintiffs' Bane Act claim.

### b.      *Wrongful Death/Negligence (Claim 5)*

The elements of a cause of action for wrongful death are a tort, such as negligence, which results in death.  *Lopez v. City of Los Angeles*, 196 Cal. App. 4th 675, 685 (2011).  A claim for negligence requires the plaintiff to show that the defendant owed them a duty of care and breached that duty, which proximately caused injury.  *Id.*  Law enforcement officers have a duty to "use reasonable force under the totality of the circumstances."  *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526, n.10 (2009).  "Law enforcement personnel have a degree of discretion as to how they choose to address a particular situation.  Summary judgment is appropriate when the trial court determines that, viewing the facts most favorably to the plaintiff, no reasonable juror could find negligence."  *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 632 (2013).  Negligence "liability can arise if the tactical conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable."  *Id.*

Plaintiffs' claim for negligence stems from the same facts underlying their Section 1983 claim excessive force claim.  "Courts generally analyze the[] claim[] under the same rubric as § 1983 claims based on the Fourth Amendment."  *Banks v. Mortimer*, 620 F. Supp. 3d 902, 935, n.13 (N.D. Cal. 2022) (citing *Diaz v. Cnty. of Ventura*, 512 F. Supp. 3d 1030, 1048 (C.D. Cal. 2021) (further citations omitted)).  Because the Court has already found that triable issues of fact preclude summary judgment on Plaintiffs' claim that the officers' use of force was unreasonable, Defendants' motion for summary judgment as to Plaintiffs' negligence claim is also denied.

### c.      *Negligent Infliction of Emotional Distress (Claim 6)*

California courts apply the "traditional elements of duty, breach of duty, causation, and damages" to Negligent Infliction of Emotional Distress (NIED) claims and recognize two

United States District Court
Northern District of California

1    categories of liability for NIED: " 'bystander' liability and 'direct victim' liability." *Burgess v.*

2    *Sup. Ct.*, 2 Cal. 4th 1064, 1072 (1992).

3    "In the absence of physical injury or impact to the plaintiff," recovery of damages for

4    emotional distress is available under a theory of bystander liability only if the plaintiff "(1) is

5    closely related to the injury victim, (2) is present at the scene of the injury-producing event at the

6    time it occurs and is then aware that it is causing injury to the victim and, (3) as a result suffers

7    emotional distress beyond that which would be anticipated in a disinterested witness." *Thing v. La*

8    *Chusa*, 48 Cal. 3d 644, 647 (1989).

9    Defendants seek summary judgment on Plaintiffs' NIED claim, arguing that Plaintiffs

10    cannot establish the required elements. ECF 62 at 31. Defendants point out that Maria was asking

11    whether Angelo was asleep and offer this to show that she lacked the required awareness. *Id.* As

12    to Isabella, Defendants assert that she did not see any force used on Angelo and that she only saw

13    him on the ground. *Id.*

14    In opposition, Plaintiffs point to testimony from Isabella that she was confused about why

15    the officers needed to have Angelo on his stomach and that Angelo made "sounds of distress"

16    before "it was silent." ECF 66 at 30. Plaintiffs point to testimony from Maria that that at one

17    point, Angelo "jerked" and thought "that was his last breath." *Id.* She told the officers, and they

18    did nothing. *Id.* Plaintiffs, however, do not point to any testimony from Isabella or Maria

19    indicating that they were aware that officers were injuring Angelo. Summary judgment in favor of

20    Defendants is therefore appropriate on this claim. *Cf. Est. of Nunis*, 2023 WL 3940563, at *13

21    (denying motion for summary judgment on NIED claim where plaintiff was the victim's daughter,

22    was present at the time officers used forced against her father, was aware that the officers were

23    causing injury, and suffered emotional distress from witnessing the use of escalating force against

24    her father).

25              d.    ***Immunity under California Government Code §§ 820.4 and***
26                    ***845.8(b)***

27    As to the state law claims, Defendants argue that California law immunizes them from

28    liability. ECF 62 at 31-32. They point to two provisions of the California Government Code—

United States District Court
Northern District of California

1   sections 820.4 and 845.8(b).

2         California Government Code § 820.4 immunizes a public employee from liability "for his

3   act or omission, exercising due care, in the execution or enforcement of any law."  California

4   Government Code § 845.8 precludes liability against a public entity or employee for:

> (a) Any injury resulting from determining whether to parole or release a prisoner or from determining the terms and conditions of his parole or release or from determining whether to revoke his parole or release.
> (b) Any injury caused by:
>     (1) An escaping or escaped prisoner;
>     (2) An escaping or escaped arrested person; or
>     (3) A person resisting arrest.

10  Cal. Gov't Code § 845.8.

11        The same disputes of material fact that necessitate denying Defendants' motion for

12  summary judgment on other claims preclude summary judgment in their favor on the basis of

13  these state law immunities.  California denies immunity to police officers who use excessive force

14  in arresting a suspect.  *See Robinson v. Solano Cnty.*, 278 F.3d 1007, 1016 (9th Cir. 2002); *see*

15  *also Fink-Carver v. Police Officer Kuhn*, No. 21-CV-00664-JSW, 2024 WL 734496, at *12 (N.D.

16  Cal. Feb. 22, 2024).  Accordingly, to the extent Defendants seek summary judgment in their favor

17  on the basis of these statutory immunities, their motion is denied.

18        **B.**    **Plaintiffs' Cross-Motion for Partial Summary Judgment**

19        Plaintiffs cross-move for partial summary judgment, in part on their excessive force claim.

20  ECF 66 at 16.  According to Plaintiffs, "it is undisputed that Angelo was handcuffed, prone and

21  non-resistant for a period of at least 4 to 5 minutes—starting when Maria first asked the Officers

22  whether Angelo was sleeping."  *Id.* at 16.  As discussed above, Defendants are entitled to qualified

23  immunity on Plaintiffs' excessive force claim to the extent it is based on the officers' handcuffing

24  of Angelo or their failure to put him in the recovery position.  Plaintiffs' cross-motion on the

25  excessive force claim is therefore denied as to those bases for the claim.  To the extent Plaintiffs

26  seek summary judgment in their favor based on the force applied during the extended prone

27  restraint, genuine disputes of material fact preclude summary judgment in either party's favor.  It

28  is for the jury to decide whether or not Angelo was resisting and whether the officers used

United States District Court
Northern District of California

reasonable force when they put Angelo on his stomach, handcuffed, and applied weight to his upper body and legs.

## IV.     CONCLUSION

For the reasons set forth above, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment and DENIES Plaintiffs' cross-motion for partial summary judgment on the excessive force claim.

**IT IS SO ORDERED.**

Dated: February 25, 2024

_____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**